# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| KIMBERLEY LAURA SMITH-BROWN, QUINN ALLEN, ILENE ANCHELL BRITTANY CAFFREY, KRIS DANE, KAREN EONTA, VALARIE HUTCHISON, KRISTEN JACKSON, CRISTINA KOVACS, MICHELLE MUSK, PAULA OGURKIEWICZ, ROBIN OKMAN, JENNIFER SACKS, VERONICA SANDERS, DEANNA SHAW, ALLISON SOT, SHASTA SWANEY, COLLEEN THORNTON, JESSICA TIFT, ALICE VITIELLO, TAMMY WALKER, and DONNA WILLIAMS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:18-cv-610  Judge: Jorge L. Alonso  Mag. Judge: M. David Weisman  **JURY TRIAL DEMANDED** |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| ULTA BEAUTY, INC. and ULTA SALON, COSMETICS & FRAGRANCE, INC., | ) ) ) | |
| Defendants. | ) ) ) ) | |

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Kimberley Laura Smith-Brown, Quinn Allen, Ilene Anchell, Brittany Caffrey, Kris Dane, Karen Eonta, Valarie Hutchison, Kristen Jackson, Cristina Kovacs, Michelle Musk, Robin Okman, Paula Ogurkiewicz, Jennifer Sacks, Veronica Sanders, Deanna Shaw, Allison Sot, Shasta Swaney, Colleen Thornton, Jessica Tift, Alice Vitiello, Tammy Walker, and Donna Williams (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, upon personal knowledge as to facts pertaining to themselves and on information and belief as to all other matters, by and through their undersigned counsel, bring this class action complaint

1

against Defendants Ulta Beauty, Inc. and Ulta Salon, Cosmetics & Fragrance, Inc. (collectively, "Defendants" or "Ulta").

## NATURE OF THE ACTION

1.      Ulta holds itself out as the largest beauty products retailer in the United States. Ulta as a mass retailer of beauty products portrays its products in such a way in its stores as to convey that they are new.  Customers who shop at Ulta reasonably believe that it only sells new products and its prices reflect that expectation.  In reality, however, Plaintiffs and other Ulta customers did not receive what they were promised.  Specifically, Defendants engaged in a pervasive, company-wide practice of taking previously returned and used beauty products, retouching them to look new, comingling them with new products in retail stores, and selling those used products as new to unsuspecting consumers.  Defendants never disclosed to Plaintiffs and the Class (defined below) their practice of reselling used beauty products as new, and in fact went to great lengths to conceal this practice.

2.      In January 2018, a former Ulta employee disclosed on Twitter that "whenever a customer would return a product, [Ulta employees] were told by managers to repackage / reseal the item and put it back on the shelf."  According to this former employee, Ulta would restock and resell used cosmetics, among many other products.

3.      After this whistleblower publicized her allegations on Twitter, dozens of other current and former Ulta employees from retail locations all over the country confirmed that substantially similar practices also occurred at the Ulta stores where they worked.  Indeed, many Ulta employees commented that they would not shop at Ulta as a result of these unsanitary and deceptive practices.  Since then, five additional former Ulta employees have come forward and submitted sworn Declarations recounting in vivid detail how they were required to participate in

Defendants' corporate policy of retouching and reshelving used beauty products and comingling them with new products. *See* Exhibits A-E attached hereto.

4.    Former employees from coast to coast have confirmed Ulta's corporate resale policy whereby Ulta management required its employees to affirmatively take steps to deceive Ulta's consumers by retouching used, dirty beauty products and comingling them with new products on the shelves such that consumers were and still are unable to determine the used from the new. Accordingly, every sale of beauty products since Ulta began this policy – which is at least as long as the relevant statutes of limitations periods in this Complaint – was tainted with the possibility that the customer purchased used, dirty beauty products, a fact nowhere disclosed to Plaintiffs and the Class and completely contrary to what Ulta shoppers reasonably expected when shopping there. Moreover, such used products are still on the shelves at Ulta's stores and being sold to unsuspecting consumers, including Plaintiffs and the Class. In fact, despite all of the former employees who have come forward to reveal Ulta's unsanitary and deceptive practices, Ulta has repeatedly and publicly reassured consumers that it did not and does not engage in this practice.[1] Due to Ulta's active concealment (both past and ongoing), Ulta consumers had and have no way to know whether the products they purchased or are purchasing have been previously used. Ulta nowhere disclosed this corporate resale policy or that it was selling in its stores used beauty products.

5.    Despite the widespread internal knowledge of these deceptive, unfair and unsanitary practices, Ulta has continued to deceive consumers for years by retouching,

---

[1] *See, e.g.,* De Elizabeth, *Ulta Beauty Accused By Former Employee Of Reselling Used Makeup*, Teen Vogue (Jan. 13, 2018, 4:35 pm), https://www.teenvogue.com/story/ulta-beauty-accused-former-employee-reselling-used-makeup; Robert Channick, *Lawsuit Alleges Ulta Resold Used Cosmetics as New*, Chicago Tribune (Feb. 9, 2018, 3:30pm), http://www.chicagotribune.com/business/ct-biz-ulta-lawsuit-resold-used-cosmetics-20180209-story.html; both last accessed March 9, 2018.

repackaging, restocking and/or reselling used beauty products, including cosmetics, at prices reflecting that they were new while omitting to disclose its corporate resale policy.

6.     As a result of Ulta's deceptive and unfair practices, including the omission that it was selling previously used products and comingling used with new products on its shelves, Plaintiffs and the other Class members did not receive that which was promised. Reasonable Ulta shoppers believed that all the products on the shelves for sale at Ulta were unused. As a result of Ulta's practice of reselling previously returned and used beauty products, every customer who has made purchases at Ulta since this practice began was put at risk of unwittingly purchasing used, unsanitary beauty products and this risk reduces the desirability and value of *all* beauty products sold by Ulta regardless of whether they were new or used. Had they known of Defendants' policy and practice of retouching, repackaging, restocking and reselling used beauty products, Plaintiffs and the other members of the Class would have paid less for the beauty products they purchased or would not have purchased them at all.

7.     While this case does not involve personal injury damages, Ulta's practice of restocking and reselling used beauty products as new to unsuspecting consumers put the health of Plaintiffs and other members of the Class at risk.

8.     Accordingly, Plaintiffs bring this action on behalf of themselves and all other similarly situated consumers to recover the amounts Plaintiffs and the other Class members overpaid, to prevent Defendants from continuing to engage in unlawful, deceptive, unfair, and unsanitary conduct, and to correct the false perception Defendants have created in the marketplace through their deceptive conduct, including misrepresentations and omissions of material facts.

## JURISDICTION AND VENUE

9.      The Court has original subject matter jurisdiction over the case under 28 U.S.C. § 1332(d) because the case is brought as a class action under Fed. R. Civ. P. 23, at least one proposed Class member is of diverse citizenship from Defendants, the proposed Class includes more than 100 members, and the aggregate amount in controversy exceeds five million dollars, excluding interest and costs.

10.      Venue is proper in this District under 28 U.S.C. § 1391 because Defendants engaged in substantial conduct relevant to Plaintiffs' claims within this District, have their principal place of business in this District, and have caused harm to Class members residing within this District.

## PARTIES

11.      Plaintiff Kimberley Laura Smith-Brown ("Smith-Brown") is a citizen of the State of California, residing in the Sherman Oaks neighborhood of Los Angeles, California.  She has an Ultamate Rewards account at Ulta.  Smith-Brown regularly purchased beauty products at Ulta, including eye liner and mascara.  Smith-Brown purchased dozens of beauty products at an Ulta store in Sherman Oaks, California, most recently lip balm on December 22, 2017.  Further, in October 2017, Smith-Brown purchased lip liner, liquid eyeliner, and two types of lip gloss.  Smith-Brown purchased these and all products believing that all of the items for sale at Ulta's retail store were unused.  However, she now believes she purchased used beauty products at Ulta.  Plaintiff would like to continue to shop at Ulta for beauty products but has no way of knowing if the products currently on the shelf are new or used.  Plaintiff plans to continue to

shop at Ulta for beauty products in the future once sufficient measures are put in place to adequately ensure used beauty products are no longer being resold by Ulta.

12.     Smith-Brown received treatment for a sty on her eyelid in or around November 2017, at which time her physician asked her if she had used anyone else's makeup.  At that time, she believed she had not as she was unaware of Ulta's undisclosed company practice of selling used beauty products as new. The sty left a scar on Smith-Brown's eyelid.  Plaintiff believes that at least one of the cosmetics products purchased by her prior to her diagnosis in November 2017 was the cause of the sty.  As discussed *infra*, Plaintiff Smith-Brown's purchases were made at a store that was identified on Twitter as being one in which used beauty products were known to be reshelved and resold as new.

13.     Plaintiff Quinn Allen ("Allen") is a citizen of the State of Maryland, residing in Baltimore.  She has an Ultamate Rewards account at Ulta.  Allen regularly purchased beauty products at Ulta, including sponge makeup applicators most recently on March 30, 2018 at the Ulta store in White Marsh, Maryland.  Allen purchased these and all products believing that all of the items for sale at Ulta's retail store were unused.  However, Allen now believes she purchased used beauty products at Ulta, including the makeup applicators referenced above, which appear to have been used, repackaged, and then resold.  Allen would like to continue to shop at Ulta for beauty products but has no way of knowing if the products currently on the shelf are new or used.  Allen plans to continue to shop at Ulta for beauty products in the future once sufficient measures are put in place to adequately ensure used beauty products are no longer being resold by Ulta.

14.     Plaintiff Ilene Anchell ("Anchell") is a citizen of the State of Florida, residing in Parkland.  She has an Ultamate Rewards account at Ulta.  Anchell regularly purchased beauty

products at Ulta, including foundation, eye shadow, eye liner, mascara, face wash, face cream and blush. During the past year, Anchell purchased dozens of cosmetic items at an Ulta store in Coral Springs, Florida, most recently foundation and blush in December 2017. Anchell purchased these and all products believing that all of the items for sale at Ulta's retail store were unused. However, Anchell now believes she purchased used beauty products at Ulta. Anchell would like to continue to shop at Ulta for beauty products but has no way of knowing if the products currently on the shelf are new or used. Anchell plans to continue to shop at Ulta for beauty products in the future once sufficient measures are put in place to adequately ensure used beauty products are no longer being resold by Ulta.

15.     Plaintiff Brittany Caffrey ("Caffrey") is a citizen of the State of Pennsylvania, residing in Carbondale. Caffrey regularly purchased beauty products at Ulta, including mascara, false eyelashes, eye lash glue and eye shadow. Most recently, Caffrey purchased mascara, eye lashes and eye shadow in December, 2017. Further, in October 2017, Caffrey purchased mascara and liquid eye shadow and in July 2017 purchased a foot treatment for dry skin. Caffrey purchased these and all products believing that all of the items for sale at Ulta's retail store were unused. However, Caffrey now believes she purchased used beauty products at Ulta. Caffrey would like to continue to shop at Ulta for beauty products but has no way of knowing if the products currently on the shelf are new or used. Caffrey plans to continue to shop at Ulta for beauty products in the future once sufficient measures are put in place to adequately ensure used beauty products are no longer being resold by Ulta.

16.     Plaintiff Kris Dane ("Dane") is a citizen of the state of Nevada, residing in Henderson. She has an Ultamate Rewards account at Ulta. Dane regularly purchased beauty products at Ulta, including exfoliates, face washes, cleansers, and hair care products. Dane

7

purchased dozens of products at an Ulta store in Henderson, Nevada and most recently purchased face cleanser in February 2018. Dane regularly purchased the same particular face exfoliate and never had a negative reaction to it. However, after Dane purchased the face exfoliate from an Ulta store in Henderson in or around May 2017, the exfoliate stung and burned her face, smelled bad, and caused a rash to develop on her face. Dane treated the rash with lotions and antihistamines. At the time that Dane purchased the exfoliate in May 2017, she did not know that Ulta resells used products, and she believed that the exfoliate and all products that she purchased from Ulta were unused. However, she now believes she purchased used beauty products from Ulta. Specifically, because Dane had such an unusual and harsh reaction to a product that she uses all the time, Dane now believes that the exfoliate she purchased from Ulta was used. Dane would like to continue to shop at Ulta for beauty products but has no way of knowing if the products currently on the shelf are new or used. Dane plans to continue to shop at Ulta for beauty products in the future once sufficient measures are put in place to adequately ensure used beauty products are no longer being resold by Ulta.

17. Plaintiff Karen Eonta ("Eonta") is a citizen of the State of Pennsylvania, residing in McMurray. She has an Ultamate Rewards account at Ulta. Eonta regularly purchased beauty products at Ulta, including makeup and skin care products. Most recently, Eonta purchased skin care products in February 2018. Eonta has on several occasions purchased products that she believes are used and which have led to skin irritation or infections. Eonta purchased these and all products believing that all of the items for sale at Ulta's retail store were unused. However, Eonta now believes she purchased used beauty products at Ulta. Eonta would like to continue to shop at Ulta for beauty products but has no way of knowing if the products currently on the shelf are new or used. Eonta plans to continue to shop at Ulta for beauty products in the future once

sufficient measures are put in place to adequately ensure used beauty products are no longer being resold by Ulta.

18.     Plaintiff Valarie Hutchison ("Hutchison") is a citizen of the State of Wisconsin, residing in Green Bay. She has an Ultamate Rewards account at Ulta. Hutchison regularly purchased beauty products at an Ulta store in Green Bay, including foundation, mascara, face cream, lipstick, and shampoo. Most recently, Hutchison purchased mascara from Ulta in 2016, which led to an eye infection that required treatment from a physician. Hutchison purchased these and all products believing that all of the items for sale at Ulta's retail store were unused. However, Hutchison now believes she purchased used beauty products at Ulta. Hutchison would like to continue to shop at Ulta for beauty products but has no way of knowing if the products currently on the shelf are new or used. Hutchison plans to continue to shop at Ulta for beauty products in the future once sufficient measures are put in place to adequately ensure used beauty products are no longer being resold by Ulta.

19.     Plaintiff Kristen Jackson ("Jackson") is a citizen of the State of Indiana, residing in Westfield. She has an Ultamate Rewards account at Ulta. Jackson regularly purchased beauty products at Ulta stores in Noblesville, Carmel, and Muncie including makeup and hair products. Most recently, Jackson purchased a pressed powder foundation with applicator sponges from Ulta in December 2017, which appeared to have been previously used before being resealed and returned to the shelf. Jackson purchased these and all products believing that all of the items for sale at Ulta's retail store were unused. However, Jackson now believes she purchased used beauty products at Ulta. Jackson would like to continue to shop at Ulta for beauty products but has no way of knowing if the products currently on the shelf are new or used. Jackson plans to

continue to shop at Ulta for beauty products in the future once sufficient measures are put in place to adequately ensure used beauty products are no longer being resold by Ulta.

20.     Plaintiff Cristina Kovacs ("Kovacs") is a citizen of the state of Illinois, residing in Chicago.  She has an Ultamate Rewards account at Ulta.  Kovacs regularly purchased beauty products at Ulta, including eyeliners, lipsticks, and eye shadow.  Kovacs has purchased dozens of items at an Ulta store in Chicago, Illinois and most recently purchased an eye shadow palette in December 2017.  When she opened the eye shadow palette, she noticed that one of the colors in the palette was of a different texture than the other colors.  The color was worn down and looked like it had been disturbed by someone placing a finger or a makeup brush onto the eye shadow. Kovacs believes the eye shadow palette that she purchased from the Ulta store in Chicago, Illinois was previously used.  Kovacs purchased this and all products from Ulta believing that all of the items for sale at Ulta's retail store were unused.  However, she now believes she purchased used beauty products at Ulta.  Kovacs would like to continue to shop at Ulta retail stores but has no way of knowing if the products currently on the shelf are new or used.  Kovacs plans to continue to shop for beauty products at Ulta stores in the future once sufficient measures are put in place to adequately ensure used beauty products are no longer being resold by Ulta.

21.     Plaintiff Michelle Musk ("Musk") is a citizen of the state of Rhode Island, residing in Warwick.  She has an Ultamate Rewards account at Ulta. In 2017, Musk purchased dozens of beauty products from an Ulta store in Warwick, Rhode Island, including foundation, eye shadow, mascara, roll-on body glitter, highlighter for her face, and other cosmetic products. Musk purchased these and all products believing that all of the items for sale at Ulta's retail store were unused.  However, she now believes she purchased used beauty products at Ulta. In 2017, Musk purchased mascara from Ulta and when she went to use it she discovered there was a

build-up of mascara on the brush and it appeared used. In 2017, Musk also purchased foundation from Ulta. The puff that came with the foundation had makeup already on it. Musk returned the mascara and foundation. Musk also purchased eyeshadow in 2017 and when she went to use it, she discovered that it was already used. Musk could not return the eye shadow because it was past the time that Ulta accepts returns for refunds. Musk would like to continue to shop at Ulta for beauty products but has no way of knowing if the products currently on the shelf are new or used. Musk plans to continue to shop at Ulta for beauty products in the future once sufficient measures are put in place to adequately ensure used beauty products are no longer being resold by Ulta.

22. Plaintiff Robin Okman ("Okman") is a citizen of the State of California, residing in Los Angeles. She has an Ultamate Rewards account at Ulta. Okman has regularly purchased beauty products at Ulta stores in Los Angeles, including mascara primer, lip gloss, and perfume oil, among many others. In 2017, she purchased a "Tightline" mascara, three lip glosses, and a bottle of "Stash Elixir", all of which she now believes were used. Plaintiff Okman purchased all of these and all products believing that all of the items for sale at Ulta's retail store were unused. However, Okman now believes she purchased used beauty products at Ulta. Okman would like to continue to shop at Ulta for beauty products but has no way of knowing if the products currently on the shelf are new or used. Okman plans to continue to shop at Ulta for beauty products in the future once sufficient measures are put in place to adequately ensure used beauty products are no longer being resold by Ulta.

23. Plaintiff Paula Ogurkiewicz ("Ogurkiewicz") is a citizen of the State of Illinois, residing in Cook County. She has an Ultamate Rewards account at Ulta. Ogurkiewicz regularly purchased beauty products at Ulta, including makeup, skincare products, and shampoo. Within

11

the past year, Ogurkiewicz has purchased hair dye, mascara, and lip cream which she believes were all previously used. Ogurkiwiecz has also suffered skin irritation in the past year from moisturizer which she purchased at Ulta and now believes was used. Ogurkiwiecz would like to continue to shop at Ulta for beauty products but has no way of knowing if the products currently on the shelf are new or used. Ogurkiwiecz plans to continue to shop at Ulta for beauty products in the future once sufficient measures are put in place to adequately ensure used beauty products are no longer being resold by Ulta.

24. Plaintiff Jennifer Sacks ("Sacks") is a citizen of the State of Michigan, residing in Highland Park. She has an Ultamate Rewards account at Ulta. Sacks regularly purchased beauty products at Ulta, including eyeliner, lip stain, and lip gloss. Most recently, Sacks purchased pore filler and eyeliner from Ulta in December 2017. Sacks purchased the products believing that all of the items on the shelf were unused; however, Sacks now believes she purchased used beauty products at Ulta. Sacks would like to continue to shop at Ulta for beauty products but has no way of knowing if the products currently on the shelf are new or used. Sacks plans to continue to shop at Ulta for beauty products in the future once sufficient measures are put in place to adequately ensure used beauty products are no longer being resold by Ulta.

25. Plaintiff Veronica Sanders ("Sanders") is a citizen of the State of Georgia, residing in Columbus. She has an Ultamate Rewards account at Ulta. Sanders regularly purchased beauty products at Ulta, including hair masks, lip glosses, and mascara. Most recently, in early February 2018, Sanders purchased foundation and mascara, the latter of which led to an eye infection, which she believes was caused because the mascara had been previously used. Sanders purchased these and all products believing that all of the items for sale at Ulta's retail store were unused. However, Sanders now believes she purchased used beauty products at

12

Ulta. Sanders would like to continue to shop at Ulta for beauty products but has no way of knowing if the products currently on the shelf are new or used. Sanders plans to continue to shop at Ulta for beauty products in the future once sufficient measures are put in place to adequately ensure used beauty products are no longer being resold by Ulta.

26.    Plaintiff Deanna Shaw ("Shaw") is a citizen of the state of Washington, residing in Vancouver. She has an Ultamate Rewards account at Ulta. Shaw regularly purchased beauty products at Ulta including moisturizers, eye makeup, eyebrow makeup, shampoo, and conditioner. Shaw purchased dozens of beauty products at an Ulta store in Vancouver, Washington and most recently purchased an eyebrow kit, eyeliner pencil, mascara, and a face moisturizer on or around December 12, 2017. The moisturizer that Shaw purchased in December 2017 did not have its usual seal on the inside lid. After Shaw used the face moisturizer, she began to develop spots and rashes on her face. In February 2018, Shaw went to a doctor to seek treatment for the spots and rashes on her face, and she was diagnosed with a bacterial infection. Shaw was prescribed antibiotics to treat the infection and attended follow-up visits with her physician and missed work. Shaw believes that she developed the bacterial infection from the moisturizer that she purchased from Ulta because the moisturizer was previously used. Shaw also purchased brow makeup and eyeliner and when she went to use them they were dried out, as if used. Shaw previously purchased these and all products believing that all of the items for sale at Ulta's retail store were unused. However, she now believes she purchased used beauty products at Ulta. Shaw would like to continue to shop at Ulta for beauty products but has no way of knowing if the beauty products currently on the shelf are new or used. Shaw plans to continue to shop at Ulta for beauty products in the future once sufficient

measures are put in place to adequately ensure used beauty products are no longer being resold by Ulta.

27.     Plaintiff Shasta Swaney ("Swaney") is a citizen of the State of South Carolina, residing in Chapin.  She has an Ultamate Rewards account at Ulta.  Swaney regularly purchased beauty products at Ulta, including skin care products, nail care products, makeup, and hair products.  Most recently, on March 8, 2018, Swaney purchased lip balm and a skin cleansing tool.  When she returned home and opened the lip balm, although sealed, it had a fingerprint in the middle of the product, as pictured:



28.     Plaintiff Swaney purchased these and all products believing that all of the items for sale at Ulta's retail store were unused.  However, Swaney now believes she purchased used beauty products at Ulta.  Swaney would like to continue to shop at Ulta for beauty products but has no way of knowing if the products currently on the shelf are new or used.  Swaney plans to continue to shop at Ulta for beauty products in the future once sufficient measures are put in place to adequately ensure used beauty products are no longer being resold by Ulta.

29.     Plaintiff Allison Sot ("Sot"), is a citizen of the State of New Jersey, residing in Berkeley Heights.  She has an Ultamate Rewards account at Ulta.  Sot has shopped both for herself and for her daughter during the relevant time period regularly in the Ulta store in Watchung, New Jersey and has done so for the last three to four years. Sot regularly purchased beauty products at Ulta, which include the following products: mascara, eye shadow, highlighter, eyeliner, primer, skin care products, bronzer, self-tanner and other beauty products including makeup brushes.  In the winter of 2017, soon after applying mascara purchased at the Watchung location, Plaintiff's daughter developed an eye infection. This particular mascara was a product that Plaintiff or her daughter (using Plaintiff Sot's account) had purchased numerous times before without any problems.  Sot purchased the products believing that all of the items for sale at Ulta's retail store were unused. However, she now believes that she purchased used beauty products at Ulta.  Sot would like to continue to shop at Ulta for beauty products but have no way of knowing if the products currently on the shelf are new or used.  Sot plans to continue to shop at Ulta for beauty products in the future once sufficient measures are put in place to adequately ensure used beauty products are no longer being resold by Ulta.

30.     Plaintiff Colleen Thornton ("Thornton") is a citizen of the State of New York, residing in Tupper Lake.  She has an Ultamate Rewards account at Ulta.  Thornton has shopped during the relevant time period regularly in stores in Watertown and Syracuse, New York, as well as Chicago, Illinois.  Thornton regularly purchased beauty products at Ulta, including makeup and skin care products.  Most recently, in mid-September 2017, Thornton purchased eye makeup in New York which she now believes was used.  The makeup led to an eye infection.  Thornton purchased these and all products believing that all of the items for sale at Ulta's retail store were unused.  However, Thornton now believes she purchased used beauty products at Ulta.  Thornton

15

would like to continue to shop at Ulta for beauty products but has no way of knowing if the products currently on the shelf are new or used. Thornton plans to continue to shop at Ulta for beauty products in the future once sufficient measures are put in place to adequately ensure used beauty products are no longer being resold by Ulta.

31. Plaintiff Jessica Tift ("Tift") is a citizen of the state of Washington, residing in Covington. She has an Ultamate Rewards account at Ulta. Tift regularly purchased beauty products at Ulta, including powder foundation, concealer, and mascara. Tift purchased dozens of cosmetic items at an Ulta store in Covington, Washington and most recently purchased mascara on February 9, 2018. Shortly after Tift first used the mascara, Tift developed a bacterial infection in her eye. After speaking to a physician, Tift was diagnosed with pink eye and prescribed antibiotic eye drops. Tift was forced to miss work due to her infection. Tift believes that she developed the bacterial infection from the mascara that she purchased from the Ulta store because the mascara was previously used before it was sold to Tift. Tift purchased the mascara and all products from Ulta believing that all of the items for sale at Ulta's retail store were unused. However, she now believes she purchased used beauty products at Ulta. Tift would like to continue to shop at Ulta for beauty products but has no way of knowing if the products currently on the shelf are new or used. Tift plans to continue to shop at Ulta for beauty products in the future once sufficient measures are put in place to adequately ensure used beauty products are no longer being resold by Ulta.

32. Plaintiff Alice Vitiello ("Vitiello") is a citizen of the State of Ohio, residing in Mentor. She has an Ultamate Rewards account at Ulta. Vitiello regularly purchased beauty products at Ulta, including cosmetics, hair care products, hair tools, and shampoo. Most recently, in early February 2018, Vitiello purchased hair products. Vitiello purchased these and

16

all products believing that all of the items for sale at Ulta's retail store were unused. However, Vitiello now believes she purchased used beauty products at Ulta. Vitiello would like to continue to shop at Ulta for beauty products but has no way of knowing if the products currently on the shelf are new or used. Vitiello plans to continue to shop at Ulta for beauty products in the future once sufficient measures are put in place to adequately ensure used beauty products are no longer being resold by Ulta.

33.     Plaintiff Tammy Walker ("Walker") is a citizen of the state of Alabama, residing in Mobile. She has an Ultamate Rewards account at Ulta. Walker regularly purchased beauty products at Ulta, including lip gloss, mascara, foundation, and hair care products. Walker purchased dozens of products at an Ulta store in Mobile, Alabama and most recently purchased a lip palette in April 2018. In November 2017, Walker purchased mascara from an Ulta store in Mobile, Alabama, but when she opened the mascara, she realized that the mascara was already dried out. If the mascara was, in fact, a new product and had never been opened, it would not have been dried out when Walker purchased it. The fact that the mascara was dried out indicates that the mascara was repeatedly opened and exposed to air or that someone had previously used up most of the liquid inside the mascara. Walker purchased this and other products believing that all of the items for sale at Ulta's retail store were unused. However, Walker now believes she purchased used beauty products at Ulta. Walker would like to continue to shop at Ulta for beauty products but has no way of knowing if the products currently on the shelf are new or used. Walker plans to continue to shop at Ulta for beauty products in the future once sufficient measures are put in place to adequately ensure used beauty products are no longer being resold by Ulta.

17

34. Plaintiff Donna Williams ("Williams") is a citizen of the state of Virginia, residing in Roanoke. She has an Ultamate Rewards account at Ulta. On numerous occasions during the relevant period, Williams purchased beauty products at Ulta, including eyeliner, mascara, and lipstick. On February 11, 2018, Williams used an eyeliner that she purchased from an Ulta store in Roanoke, Virginia. Her eyes became red and irritated. Her eyes were so irritated that she was unable to wear eye makeup for a period of time. Once the irritation cleared up, she used the eyeliner again, and she experienced the same negative reaction. Realizing that the eyeliner was the problem, she returned the eyeliner to Ulta and told the store employee what happened. Ulta refunded her the price she paid for the eyeliner. Williams now believes that she has purchased other used products from Ulta during the relevant period, including a lipstick and setting spray. At the time Williams purchased the eyeliner and the other products from Ulta, she did not know that Ulta resells used products, and she believed that all of the items for sale at Ulta's retail store were unused. Williams would like to continue to shop at Ulta for beauty products but has no way of knowing if the products currently on the shelf are new or used. Williams plans to continue to shop at Ulta for beauty products in the future once sufficient measures are put in place to adequately ensure used beauty products are no longer being resold by Ulta.

35. Defendant Ulta Salon, Cosmetics & Fragrance, Inc. is a Delaware corporation headquartered in Bolingbrook, Illinois. Accordingly, Defendant Ulta Salon, Cosmetics & Fragrance, Inc. is a citizen of Illinois and Delaware. Defendant Ulta Salon, Cosmetics & Fragrance, Inc. is a wholly-owned subsidiary of Defendant Ulta Beauty, Inc. Defendant Ulta Salon, Cosmetics & Fragrance, Inc. was incorporated on January 9, 1990 and became a wholly-owned subsidiary of Defendant Ulta, Beauty, Inc. on or about January, 29, 2017.

36.     Defendant Ulta Beauty, Inc. is a Delaware corporation headquartered in Bolingbrook, Illinois.  Accordingly, Defendant Ulta Beauty, Inc. is a citizen of Illinois and Delaware.  The most recent Form 10-K for the 2017 fiscal year ended February 3, 2018 filed by Ulta Beauty, Inc. on April 3, 2018 (hereinafter "Fiscal 2017 10-K"), at 1, states as follows: "References in this Annual Report on Form 10-K to 'we,' 'us,' 'our,' 'Ulta Beauty,' 'the Company' and similar references mean Ulta Beauty, Inc. and its consolidated subsidiaries, unless otherwise expressly stated or the context otherwise requires."  As such, Ulta Beauty, Inc. does not generally distinguish between itself and its consolidated subsidiaries, including Defendant Ulta Salon, Cosmetics & Fragrance, Inc., and refers to them all collectively. For example, the Fiscal 2017 10-K filed by Ulta Beauty, Inc. states, at 2, "We were founded in 1990," referring to the incorporation date of Defendant Ulta Salon, Cosmetics & Fragrance, Inc.  Additionally, Ulta Salon, Cosmetics & Fragrance, Inc. does not appear to have a CEO, Chairman of the Board, or Board of Directors separate from Ulta Beauty, Inc.  As a result, there is no separate decision-making apparatus for Ulta Salon, Cosmetics & Fragrance, Inc. and the Board of Directors and CEO of Ulta Beauty, Inc. exert direct control over Ulta Salon, Cosmetics & Fragrance, Inc.

37.     Additionally, until the January 29, 2017 reorganization, Defendant Ulta Salon, Cosmetics & Fragrance, Inc. did not have a parent corporation and was the operating entity for all of its stores.  As a result, for part of the relevant period, Defendant Ulta Salon, Cosmetics & Fragrance, Inc. had total operating authority over its stores, while after the reorganization, Defendant Ulta Beauty, Inc. acquired direct operating authority over its stores.

38.     Thus, in this Complaint, Plaintiffs adopt this terminology and references to "Ulta" or "Defendants" mean "Ulta Beauty, Inc. and its consolidated subsidiar[y Ulta Salon, Cosmetics & Fragrances, Inc.], unless otherwise expressly stated or the context otherwise requires," as

stated in the Fiscal 2017 10-K (at 1). According to that Fiscal 2017 10-K (*id.*), Defendants are "the largest beauty retailer in the United States and the premier beauty destination for cosmetics, fragrance, skin care products, hair care products, and salon services."

39. On January 29, 2017, Ulta Beauty, Inc. implemented a reorganization plan such that "[i]mmediately after consummation of the Reorganization, Ulta Beauty[, Inc.] has, on a consolidated basis, the same assets, businesses, and operations as [Ulta] Salon[, Cosmetics & Fragrance, Inc.] had immediately prior to the consummation of the Reorganization."[2] According to Fiscal 2017 10-K, at 2, "On January 29, 2017, we implemented a holding company reorganization pursuant to which Ulta Beauty, Inc., which was then incorporated as a Delaware corporation in December 2016, became the successor to Ulta Salon, Cosmetics & Fragrance, Inc., the former publicly-traded company and now a wholly owned subsidiary of Ulta Beauty[, Inc.]." In that 10-K, Ulta Beauty, Inc. reported its financial results on a consolidated basis for all four of its subsidiaries, one of which is Defendant Ulta Salon, Cosmetics & Fragrance, Inc. In the Notes to Consolidated Financial Statements, it states as follows: "As used in these notes and throughout this Annual Report on Form 10-K, all references to 'we,' 'us,' 'Ulta Beauty,' or the 'Company' refer to Ulta Beauty, Inc. and its consolidated subsidiaries." *Id.* at 52.

40. According to Ulta's Fiscal 2017 10-K, Ulta has a strict hierarchical pyramid of reporting duties, from associates and store managers up through the Chief Executive Officer. *Id.* at 7-8. "The management team in each store reports to the general manager. The general manager oversees all store activities including salon management, inventory management, merchandising, cash management, scheduling, hiring, and guest services…. Each general manager reports to a district manager, who in turn reports to a Regional Vice President of Operations, who in turn reports to the Senior Vice President of Store Operations, who in turn

---

[2] *See* Ulta Beauty, Inc. (Jan. 30, 2017), Form 8-K12B, at 2.

reports to our Chief Store Operations Officer, who in turn reports to the Chief Executive Officer." *Id.* at 7. Many operations are also centrally controlled, including inventory, sales forecasting, computer systems and store merchandising. *Id.* at 6-7.

41. According to Ulta, management closely monitors its inventory: "To ensure our inventory remains productive, our planning and replenishment group, along with senior executives, monitor the levels of clearance and aged inventory in our stores on a weekly basis." *Id.* at 6. Technology is paramount at Ulta and the stores, management and employees are all connected. There is "a company-wide network that connects all corporate users, stores, and our distribution center infrastructure and provides communications for credit card and continual polling of sales and merchandise movement at the store level." *Id.* at 8.

42. Ulta employees are trained so that all policies are consistently applied in all stores. As stated in the Fiscal 2017 10-K, "[a]ll of our associates participate in an interactive new-hire orientation through which each associate becomes acquainted with Ulta Beauty's mission, vision, and values. We train and educate our new store managers, prestige beauty advisors, and sales associates on our beauty products and services, our policies and procedures, opening and closing routines, guest service expectations, loss prevention practices, and our culture." *Id.* at 8. Thus, Ulta uniformly trains its employees to enforce its loss prevention practices, including its policies relating to the retouching and reshelving of returned and used beauty products.

43. Consistent with its vigilance over its inventory, Ulta maintains a reserve for shrink, or inventory losses, which includes customer returns: "We record a shrink reserve representing management's estimate of inventory losses by location that have occurred since the date of the last physical count. This estimate is based on management's analysis of historical

21

results and operating trends." *Id.* at 39.  According to Schedule II – Valuation and Qualifying Accounts, the shrink reserves (balance at end of each respective period) were as follows:

Fiscal 2013:  $ 9,358,000[3]

Fiscal 2014:  $11,598,000[4]

Fiscal 2015:  $15,259,000[5]

Fiscal 2016:  $19,065,000[6]

Fiscal 2017:  $15,144,000[7]

44.    As stated in the Fiscal 2017 10-K, "[m]embers of store management receive bonuses depending on their position and based upon various metrics."  *Id.* at 7.  As discussed more fully below, this includes what is commonly known to employees as a "shrink bonus," which rewards store managers for reshelving used products for resale, instead of leaving them in the damage bin and sending them back to warehouses or to corporate.  Ulta thus incentivized store managers to retouch and reshelve used products and disguise them as new. Significantly, Ulta never disclosed to the public, including Plaintiffs and the Class, that the stores were actually selling used beauty products as new.

## FACTUAL ALLEGATIONS

45.    As of February 3, 2018, Ulta operates 1,074 retail stores across 48 states and the District of Columbia.  *See* Fiscal 2017 10-K at 4.  Ulta offers "All Things Beauty, All in One Place," selling more than 20,000 products from approximately 500 well-established and emerging beauty brands across all categories and price points, including its own private label.

---

[3] *See* Ulta Salon, Cosmetics & Fragrance, Inc. (March 30, 2016), Form 10-K for the fiscal year ended January 30, 2016, at 63.
[4] *Id.*
[5] *Id.*
[6] *See* Fiscal 2017 Form 10-K, at 69.
[7] *Id.*

*Id.* at 1. Ulta lists as its categories of beauty products "cosmetics, fragrances, skin care products, [and] hair care products…." *Id.* Ulta also offers a full-service salon – featuring hair, skin, and brow services – in every store. *Id.* at 2. In addition, Ulta sells products through its website, ulta.com.

46. Customers are encouraged to sign up for the "Ultamate Rewards" program, earning points that are connected to each customer's unique member number, which they can then redeem on any of Ulta's more than 20,000 products. *Id.* at 2. According to Ulta, it has "approximately 28 million active Ulta Beauty guests enrolled in [its] Ultamate Rewards loyalty program. Loyalty member transactions represent more than 90% of [its] annual total net sales…." *Id.*

47. Ulta touts its ability to track customer data with its sophisticated Customer Relationship Management ("CRM") platform: "Our CRM platform enables sophisticated mining of the customer data in our loyalty member database…." *Id.* at 7. According to Ulta, "[w]e believe our loyalty program, combined with our growing CRM capabilities, provide a significant long-term competitive advantage for Ulta Beauty." *Id.* at 2.

<u>Ulta's Policy of Reselling Used Beauty Products</u>

48. Ulta has been described as one of the cosmetics stores with the "best return policy."[8] Customers may return products to Ulta stores if they are not 100% satisfied for any reason within 60 days for a full refund, or past that for store credit.

49. Customers may return any Ulta product they purchased, either at an Ulta store or online, by bringing the item to a cash register at any Ulta store. The Ulta employee working at the register exercises his or her discretion as to whether to the item is salvageable to be resold to

---

[8] *See* https://www.huffingtonpost.com/entry/makeup-store-return-policies_us_56e0823ce4b065e2e3d48bd7, last accessed May 18, 2018.

consumers and then prints a tag that either states "Damaged" or "Return to Shelf."  Returned items that are designated as being "Returned to Shelf" are placed on the shelves at Ulta stores alongside new products.  The items designated as "Damaged" (the "Damaged Products") are placed into that store location's "damage bin" with other Damaged Products.

50.     Upon returning their Ulta products, customers often inform the Ulta employee working the register that he or she used the product prior to returning it.  However, under Ulta's policy, the fact that a product has been previously used does not disqualify a product from being designated as "Return to Shelf."  Indeed, Ulta employees regularly designate products as "Return to Shelf," even after the employees are informed by customers that the products were previously used.

51.     Upon information and belief, Ulta's policy, as instructed to its employees who must choose whether a returned product should be designated as "Damaged" or "Return to Shelf," is that this determination is purely a cosmetic one.  If a returned item *looks* like it could be resold to consumers, regardless of whether it has been previously used, Ulta's policy is that the product should be designated as "Return to Shelf" and is comingled with new products on Ulta store shelves, and resold to other consumers.  Ulta employees are not to consider whether a product has been previously used; whether the customer complained of having any allergic or negative reaction to the product; or any other health and safety considerations.  As a matter of practice, Ulta employees routinely and knowingly designate used, unsafe, and unsanitary products as "Return to Shelf" simply because the returned products look acceptable enough to blend in with the other new products sold on the shelves at Ulta stores.

52.     If a returned product does not look acceptable enough to blend in with the other new products on Ulta's shelves, but can be altered such that the product will blend in with new

24

products, then Ulta instructs its employees to fix or alter the cosmetic appearance of the product, designate the product as being "Return to Shelf," and resell the product to other consumers. Therefore, upon information and belief, Ulta employees regularly clean or alter used products to hide the fact that the product has been used.  For example, if a returned eye shadow pallet has been used, and the makeup squares on the palette have smeared outside the lines, Ulta employees are instructed to clean only the part of the palette where the makeup has smeared, and then resell the used makeup palette as new.  If a customer returns a lipstick that is misshapen because it has been used by a customer, Ulta employees are instructed to smooth the edges of the lipstick and (if the lipstick then looks like new) resell the lipstick.

53.     After used products are returned to the shelves at Ulta stores, they are comingled with new products such that customers cannot distinguish between new products or used products that are being resold.

54.     When customers return items that are designated as "Damaged," those Damaged Products are placed in the damage bin, the items inside of which are intended to be destroyed in the field, returned to the Ulta warehouse, or otherwise "damaged out."  However, the Damaged Products are "damaged out" at regularly scheduled weekly or monthly intervals, not every day. Before these items can be damaged out, Ulta employees regularly remove Damaged Products from the damage bin to be retouched and resold to consumers.

55.     Upon information and belief, Ulta's policy is to encourage employees to "salvage" any Damaged Products in the damage bin that look acceptable enough – or can be retouched so that they look acceptable enough – to blend in with new products and be resold. Throughout the week or month before the damage bin is emptied, supervisors at Ulta regularly instruct their subordinate employees to look through the damage bin and pull out any items that

25

look new (or can look new with cosmetic alterations), remove the "Damaged" tag from these items, clean the items, and then place the items back on the shelves to resell as new.

56.     The employees who remove Damaged Products from the damage bin are typically not involved in the process by which these products were originally designated as "Damaged" at the register, and are not aware of any information disclosed by the customer who returned the product, such as whether the customer previously used the product, whether the customer had an allergic or negative reaction from the product, whether the customer believes that he or she caught an infection or illness from the product, or any similar hygienic or safety concerns. Regardless, the employees who remove Damaged Products from the damage bin are instructed to only take the cosmetic appearance of the product into consideration when determining whether the product can be resold as new.

57.     Even at the time the items in the damage bin are scheduled to be destroyed in the field, returned to the warehouse, or otherwise "damaged out," the Ulta employees responsible for destroying and/or shipping the products in the damage bin are instructed to give the products another look to see if any of them can be "salvaged."   Therefore, as a matter of practice, Damaged Products are regularly removed from the damage bin and placed back on the shelves moments before the products are scheduled to be destroyed in the field or damaged out.

58.     As a result, used and unsanitary products are regularly removed from the damage bin, stripped of their "Damaged" tag, placed back on Ulta's shelves, comingled with new products, and resold to consumers as new.

59.     Even if a returned item had not been used at the time that it was placed in the damage bin, all of the products in the damage bin are nevertheless comingled with used, unsanitary, and potentially unsafe products that were also placed in the damage bin.  Therefore,

all of the items in the damage bin have likely been exposed to germs, bacteria, or other contamination.

60.     After the Damaged Products are shipped to Ulta's warehouse, the Ulta employees at the warehouse are instructed to give these Damaged Products a final look to see if any of them can be "salvaged."  Upon information and belief, employees at Ulta's warehouse examine by hand Damaged Products, retouch them as needed to make them look new, and place them on the warehouse stock shelves to be shipped back to Ulta stores to be sold as new products.  These warehouse employees are typically unaware of the reasons why Ulta's store employees initially designated these items as "Damaged" or why the store employees chose not to remove these items from the damage bin.  Regardless, the employees at Ulta's warehouse – like all employees at Ulta's stores – are instructed to only consider the products' cosmetic appearance in deciding whether the product should be put back into inventory to be sent to stores and resold to consumers.

61.     As such, Ulta's return policy allows for the reselling of used, unsanitary, and unsafe beauty products as new products.  Such products are placed on the shelves at Ulta's stores and comingled with new products such that customers cannot distinguish new products from used products.  Because Ulta customers reasonably believe that all products for sale at the Ulta stores are new and unused, and Ulta never discloses that it has a policy to reshelve used beauty products, Ulta customers, including Plaintiffs and the Class, did not receive what they bargained for (to shop in a store that sells only new and unused products) and instead shopped unwittingly in a store that reshelves used beauty products comingled with new.  If they had known the truth about Ulta's policy, they would have paid less for these beauty products or would not have purchased them at Ulta.

27

<u>The Twitter Revelation</u>

62.     On January 9, 2018, a former Ulta employee revealed a dark secret about the beauty giant.  According to this employee, who posted her allegations to Twitter using the handle @fatinamxo, used products returned to Ulta are made to "look new" – but not sanitized – and put back on the shelf to sell to unsuspecting customers.   Providing just a handful of examples, @fatinamxo posted the pictures below of used foundation sticks and liquid lipsticks, which Ulta repackaged to be sold as if they were new.



63.     This former employee claimed that Ulta staff members were trained to "restore" products, and that managers kept a close eye on whether "items in the damage bin [] looked resell able [sic]."  According to @fatinamxo, Ulta managers "even taught [employees] how to clean eyeshadow [sic] palettes and let it dry over night [sic] so it can be repackaged and sold the next day."

64.     @fatinamxo also claims that she contacted Ulta corporate, and was surprised when she was told only that the company "definitely want[s] to be hygienic" when it comes to

28

mascara.  After clarifying that Ulta is "reselling everything that they can clean up and make 'new' again," @fatinamxo was told that someone from corporate would look into the situation.

65.    @fatinamxo says she shared her experience because she thought "makeup lovers should know what's going on behind closed doors."

66.    Creating a social media frenzy, @fatinamxo's allegations prompted responses from other Ulta employees from different locations, many of whom divulged similar practices taking place at the stores where they worked.[9]



---
[9] All pictures reproduced herein are screenshots, which have been copied exactly as they appear online. Any words or images that have been crossed out or otherwise altered were in the original.

29



I work at ulta too and i think it's disgusting the things that they try to resell!

11:17 AM

67.     Many employees disclosed that, even when they tried to push back against these "disgusting" policies, managers would insist that "resellable" products be put back on the shelves:



Hello I read your thread on ulta and I used to work there. My manger would actually write us up if we put "re sellable" items in the damage bin. I would get into arguments with my managers about lip sticks and eye-shadow and how they're clearly used. It's bad

10:50 AM

68.     While @fatinamxo thought these practices were only occurring at her store, within one day of posting her story on Twitter, she had received messages from current and former Ulta employees from stores throughout the country – including California, Washington, Texas, Florida, Michigan, South Carolina, Wisconsin, and Ohio – all of whom confirmed that similar practices occurred in those locations.  The list continues to grow.



Can 100% confirm this is true. Shopping at any ULTA in Frisco, Mckinney, Denton, Sherman, Allen, basically the entire Dallas area and around they train every single employee to do this. All the stores in this area do this.



69.     One Twitter user responded that she had worked at three different Ulta locations,

***all*** of which resold used products:



70.     One Twitter user publicly responded to @fatinamxo complaining that she had

witnessed Ulta's practices described above as an employee and identified to @fatinamxo that she

used to work at store "#1221" in Sherman Oaks, California. This is the same store that Plaintiff Kimberley Laura Smith-Brown routinely purchased from, as alleged *supra*.

71.     Other employees have contacted media outlets with similar stories. For example, a former manager from an Ulta location in Ohio reached out to *Business Insider*, claiming that "there was often pressure to sell used products." According to this manager, who wished to remain anonymous:

> Our bosses constantly told us if it looked like it could be sold, put it back out. The company always had a percentage they wanted you to stay below weekly in what we damaged. We would literally get lectured by our boss on our conference calls if our stores were over.[10]

72.     This manager admitted that cleaning used cosmetics had been discussed and he told *Business Insider* that "returned mascara and foundation were almost always placed back on the shelf since it was difficult to tell if they were used, and his staff would clean bottled products to make them look like new again." When items like shampoo or lotion were returned, Ulta employees "would wipe out the spout and turn the pump cap back down."

73.     Another former Ulta employee, who worked at a store in Rock Hill, South Carolina, told *Business Insider* that "[i]f there was 80% or more left in the bottle" of used hair-care and skin-care products, Ulta employees would put the bottle back on the shelf.

74.     At least one Ulta employee claimed that these practices led her to shop at one of Ulta's primary competitors, even when she worked for the company:

---

[10] http://www.businessinsider.com/ulta-employees-have-accused-the-company-of-selling-used-makeup-2018-1?r=UK&IR=T, last accessed Apr. 27, 2018.



holy shit my store did the same!! i've always shopped at sephora, even when i was an ulta employee. ~~i've~~ ~~~~ ~~but don't want~~ ~~~~ i left the corporation bc overall they don't care about anything but money & reducing their shrink

1:51 AM

75.     Another Ulta employee stated that she will "only buy product straight from the shipment truck" because the Ulta location where she works also sells used products:



Replying to @fatinamxo

Our store does the same things and I only buy product straight from the shipment truck. It's truly disgusting and disturbing

76.     Even employees who claim that their Ulta stores "avoided selling used products" stated that "unused products in good condition were fair game."   However, regarding how employees determined that returned products were unused, although it may be obvious when certain products have been used, with products like mascara and foundation, where it is difficult to tell if they have been used, it appears that the test was whether the product "looked 'sellable.'" According to one former Ulta employee, employees would always "play[] the guessing game" to determine whether a product was "overly used."

33

Hi girl, I've worked at ULTA and Sephora and my ULTA was always playing the guessing game, if it didn't seem to be used or THAT used they would put it back. If it was overly used they would swap it out for the current tester and take the old empty tester as the damage to send back to the company. Once an employee didn't check good enough and they put out a cleanser that was just soap and water as a tester 😂 at Sephora if the box is even slightly tampered with it gets sent back, they don't chance it at Sephora and will only resell if it's 100% sealed. This is just from my experience anyway.



6:36 AM

77.     Multiple employees claim that the practices described by @fatinamxo and others were created by complaints from management that the stores were "damaging too much product."  As alluded to below, given Ulta's extremely liberal return policy, damaging returned products rather than putting them back on the shelves would have cost Ulta a lot of money.



Trayli @trayleesi · Jan 10

Replying to @fatinamxo

I was a prestige manager at Ulta and I can confirm that A LOT of managers are guilty of this. Our management team didn't allow it, but our general manager tried to get us to put used product back. We would purposely gunk it up even more so she couldn't tell us to put it back.

💬 2        ⇄              ♡

Trayli @trayleesi · Jan 10

But the reason they do it is because the company is REALLY strict about damages and will crack down if your store has too many even though it's ulta's return policy that's the problem. Loss provention came into our store and lectured us about damaging too much product.

78.     Even if a particular employee attempted to "damage" a product when it was returned, some managers would still put the used products back on the shelves:

34



Same at the ULTA I work at.. Honestly this is one of many reasons why I am over this job.. it's disgusting.. I literally had to check myself because I found myself "seeing" if it could be sold knowing it was used. I damage out anything that has been used even if one time. Unfortunately even when we damage it out at the cash wrap it still has to go through management who actually does the damaging and they will literally put it back on the shelf. I hate it! It's inconsiderate/selfish...

79.     As these allegations have spread, increasing numbers of outraged Ulta customers

have been demanding answers and threatening to take their business elsewhere:

**40 the Scammer**
@littleforty

@ultabeauty explain your nasty, fraudulent selves before I bring all my business to @Sephora twitter.com/fatinamxo/stat...

10:47 PM - Jan 10, 2018

**dead girl walking**
@dallonweaks

@ultabeauty fix your return system so that no one can return makeup/beauty projects used or not, because it's a HEALTH RISK. nasty ass.

10:52 PM - Jan 10, 2018

**LP**
@pasqlee

@ultabeauty are you going to address the rumors about your return policy or nah? Cause if you're not, I'm boycotting you

10:53 PM - Jan 10, 2018

80.     Some customers have even claimed that Ulta employees admitted that returned items would be resold, such as this comment from a customer using the same store as Plaintiff Ilene Anchell.



81.     On December 13, 2017, an Ulta shopper posted the following on Yelp:



82.     Moreover, according to both Twitter posts made in response to @fatinamxo's allegations and posts in response to a Reddit user asking Ulta employees "what happens to the returns that people bring back," it appears that this practice has been going on for quite some time – and that Ulta has been aware of the issue for years:





**kayevalentine** 10 points 1 year ago
They must put it back on the shelves some of the time, I purchased a swamp queen palette the other day (there was one on the shelf and I already have one but I really did love it, so I grabbed this one as backup because I know I'll probably never see it again). Got home and opened it to find it had CLEARLY been not only opened, but definitely at least swatched. Look card was stuffed in and looked like it had been folded up, the plastic cover and brush were dirty, and all shadows and powders were definitely at least swatched. I was kinda pissed, but I didn't want to risk having to give it back so I just sanitized it and moved on.

permalink  embed  save

**Tghyro** 31 points 1 year ago
That could just have been someone playing around. Some people will will open a product and swatch it and stuff even though there are testers

permalink  embed  save  parent

**kayevalentine** 3 points 1 year ago
Could have been, but it seems like it was returned since the enclosed card was folded up, then unfolded and put back in.

permalink  embed  save  parent

### The Aftermath of the Twitter Revelation: Additional Ulta Employees Reveal In Sworn Declarations That They Were Instructed to Retouch Used Beauty Products and Reshelve Them to Sell as New

83.     After the social media frenzy revealing Ulta's pervasive, company-wide deceptive practices, five additional former Ulta employees have stepped forward, further describing Ulta's corporate policy as well as directives from Ulta executives to retouch returned used items and make them appear as new before reshelving them and that such directives be faithfully followed at the Ulta retail stores.  *See* Exhibits A (Tammy Geier), B (Kami Turner), C (Ella Soto), D (Laura Hornick), and E (Michael Fisher) attached hereto.  The first three of these former employees worked at times in stores within the Southern Region which were all managed under a single Vice President named Chrissie Mollicone, and two of those (Tammy Geier and Kami Turner, both General Managers) reported at times to the same District Manager, Sara Ramsey, within that region.  The fourth former employee (Laura Hornick) was a Prestige Manager in Brandon, Florida. The fifth former employee worked in California, which was within the West Region.  This further supports the Twitter postings demonstrating that the policy was nationwide.

84.     According to one of these former employees (Fisher), who was, among other things, an Ulta General Manager in California, he attended the General Manager conference in Chicago, Illinois in or about 2011, where Ulta senior management discussed "shrink," which includes the percentage of products that are returned to the stores by customers and the lost revenues associated therewith.  *See* Exhibit E at ¶¶ 4-5.  Senior management stated that something needed to be done about shrink but that the General Managers would be told more at the regional level.  *Id.*  According to this former employee, after this conference, the Regional Vice President for the West Region trained him and others how to make used returned goods look new and return them to the shelves for resale.  *Id.* at ¶¶ 6-8.

85.     Two of the former employees from the Southern Region (Geier and Turner) describe in their Declarations how the Vice President (Mollicone) and District Manager (Ramsey) visited their stores in person to ensure they were following the directive to take all but the most damaged returned goods out of the damage bin and make them look like new so they could be reshelved and resold.  *See* Exhibit A at ¶ 6; Exhibt B at ¶ 9.  Both of these former employees describe receiving communications by email from Ulta management when they were General Managers of their stores containing "tips and tricks" for attempting to restore and repackage dirty used make-up and beauty tools.  *See* Exhibit A at ¶ 5; Exhibit B at ¶ 4.  Both of these former employees describe in detail that virtually every category of product in the store was subject to this policy, including returned and used lipsticks, eye shadow palettes, foundation, perfume, hair and make-up brushes, shampoo and other hair care products, creams and lotions. *See* Exhibit A at, *e.g.*, ¶¶ 6, 8, 10, 11; Exhibit B at ¶ 10.  And both former employees recount how they were summarily fired after questioning these unsanitary practices.  *See* Exhibit A at ¶¶ 9-10, 12; Exhibit B at ¶¶ 11-12.

86. All three of these former employees who worked at the General Manager level describe in their Declarations how Ulta paid General Managers of the stores a "shrink bonus" if the shrink percentage (i.e. including returned goods) was below a certain number set by Ulta. *See* Exhibit A at ¶ 3; Exhibit B at ¶ 5; Exhibit D at ¶ 7; and Exhibit E at ¶ 9.

87. Moreover, all five of these former employees describe how they were instructed to not only reshelve used products for resale, but also to put out returned used products as "testers" in the stores. *See* Exhibit A at ¶ 6; Exhibit B at ¶ 7; Exhibit C at ¶ 7; Exhibit D at ¶ 5; Exhibit E at ¶ 10. Testers are samples of the product that are placed by store personnel in front of an item so that shoppers can try the item before purchasing it. Typically stores place Q-tips and cotton balls next to the testers so that customers do not actually touch them and they can thus remain sanitary for all. However, putting out a used returned product as a tester has great potential to spread disease and germs to those who use it.

88. Ulta's retouching, repackaging and resale policy is unsanitary and hazardous to the public. Experts are in agreement on this issue. For example, Dr. Mark Jacquot, O.D., clinical director at LensCrafters, explained that "[u]sed makeup, particularly eye makeup, can be dangerous since another person's germs may be hazardous to you…" Dr. Jacquot added that "[t]he former user's health history and sanitation habits are also unknown when buying used makeup, putting you at greater risk if they used the makeup when they were sick or had an eye infection or did not wash their hands or brushes before applying the makeup." An associate clinical professor of dermatology at New York's Mount Sinai Hospital shared these concerns: "Using makeup which has been used by someone else is like applying makeup daily at the local department store cosmetics counter…There is simply no guarantee that the products are germ

free, and who would want to risk that? Not sharing makeup is the number one rule to keeping your cosmetics safe."[11]

89.     Similarly, in an article on Allure's website, a board-certified dermatologist, Dr. Sejal Shah, explained the dangers inherent in used make-up. "Used makeup can be contaminated with bacteria, fungus, or other microorganisms which can put you at risk for dangerous infections and potentially other adverse effects as a result of these infections…This is especially true for makeup that has reusable applicators, comes into contact with the skin directly, or comes in a container that requires fingers or applicators dipped into it."[12]

90.     Ulta as a mass retailer of beauty products portrays its products in such a way in its stores as to convey that they are new. Customers who shop at Ulta reasonably believe that it only sells new products and its prices reflect that expectation. Ulta's widespread and surreptitious practice of retouching, repackaging, reshelving, and reselling used returned beauty products mixed in with new ones means that every sale since Ulta began this policy is tainted with the possibility that the customer is purchasing used, dirty beauty products when reasonable customers believed while shopping there that every product sold by Ulta was unused. For example, if a medical company found its employees were repackaging and comingling used hypodermic needles with batches of new, sterile needles offered for sale, then none of those needles would be safe to use and the only solution that could protect customers would be to dispose of every possibly adulterated lot.

---

[11] Nikki Gaskins, *Is Buying Used Makeup a Safe and Low-Cost Way to Try High-End Products?*, moreBeauty, https://www.more.com/beauty/makeup/makeup-tools-products/buying-used-makeup-safe-and-low-cost-way-try-high-end-products, last accessed March 9, 2018.

[12] Macaela Mackenzie, *"Used Makeup Is Apparently All the Rage – And It's Gross"*, Allure, March 17, 2017; https://www.allure.com/story/used-makeup-not-safe, last accessed March 9, 2018.

91. Ulta's undisclosed practice of reselling used beauty products comingled with the new ones at prices reflecting the value of unused products to customers who had a reasonable belief that all products sold at Ulta are unused reduced the desirability and value of *all* such products sold by Ulta regardless if they were new or used. Had Plaintiffs and the Class members known of this practice, they would not have purchased beauty products from Ulta or would have paid less for them.

92. In addition and/or in the alternative, because Plaintiffs have no way to tell whether the beauty products they purchased at Ulta were actually new or previously used due to Ulta's widespread and surreptitious undisclosed policy or practice of comingling used products with the new products being sold, Plaintiffs and the Class, in order to protect themselves from the health risks posed by using used contaminated beauty products, are unable to safely continue using any of their previously purchased Ulta products still in their possession, and have been damaged by their inability to continue to use their previously purchased beauty products from Ulta for safety reasons.

## CLASS ALLEGATIONS

93. Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), on behalf of a Class defined as follows (sometimes referred to as the "Nationwide Class"):

> All persons in the United States who purchased, other than for resale, beauty products from Ulta Beauty retail locations.

Excluded from the Class are: (i) Defendants and their officers and directors, agents, affiliates, subsidiaries, and authorized distributors and dealers; (ii) all Class members that timely and validly request exclusion from the Class; and (iii) the Judge presiding over this action. The claims also do not include personal injury claims.

42

94.    Alternatively, Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of the following subclasses (sometimes collectively referred to as the "State Subclasses"):

A.    All persons who purchased, other than for resale, in the State of Alabama, beauty products from Ulta Beauty retail locations.

B.    All persons who purchased, other than for resale, in the State of California, beauty products from Ulta Beauty retail locations.

C.    All persons who purchased, other than for resale, in the State of Florida, beauty products from Ulta Beauty retail locations.

D.    All persons who purchased, other than for resale, in the State of Georgia, beauty products from Ulta Beauty retail locations.

E.    All persons who purchased, other than for resale, in the State of Illinois, beauty products from Ulta Beauty retail locations.

F.    All persons who purchased, other than for resale, in the State of Indiana, beauty products from Ulta Beauty retail locations.

G.    All persons who purchased, other than for resale, in the State of Maryland, beauty products from Ulta Beauty retail locations.

H.    All persons who purchased, other than for resale, in the State of Michigan, beauty products from Ulta Beauty retail locations.

I.    All persons who purchased, other than for resale, in the State of Nevada, beauty products from Ulta Beauty retail locations.

J.    All persons who purchased, other than for resale, in the State of New Jersey, beauty products from Ulta Beauty retail locations.

K.    All persons who purchased, other than for resale, in the State of New York, beauty products from Ulta Beauty retail locations.

L.    All persons who purchased, other than for resale, in the State of Ohio, beauty products from Ulta Beauty retail locations.

M.    All persons who purchased, other than for resale, in the State of Pennsylvania, beauty products from Ulta Beauty retail locations.

N.    All persons who purchased, other than for resale, in the State of

Rhode Island, beauty products from Ulta Beauty retail locations.

O.   All persons who purchased, other than for resale, in the State of South Carolina, beauty products from Ulta Beauty retail locations.

P.   All persons who purchased, other than for resale, in the State of Virginia, beauty products from Ulta Beauty retail locations.

Q.   All persons who purchased, other than for resale, in the State of Washington, beauty products from Ulta Beauty retail locations.

R.   All persons who purchased, other than for resale, in the State of Wisconsin, beauty products from Ulta Beauty retail locations.

Excluded from the State Subclasses are: (i) Defendants and their officers and directors, agents, affiliates, subsidiaries, and authorized distributors and dealers; (ii) all subclass members that timely and validly request exclusion from the subclass; and (iii) the Judge presiding over this action. The claims do not include personal injury claims. The Nationwide Class and State Subclasses are sometimes collectively referred to as the "Class."

95.   Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

96.   The members of the Class are so numerous that joinder of the Class members would be impracticable.

97.   Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

A.   Whether Defendants engaged in the conduct alleged;

B.   Whether Defendants misrepresented used beauty products as new and comingled new and used on the shelves at Ulta stores without disclosing same;

44

    C.    Whether Plaintiffs and the Class members paid more for products than they otherwise would have had they known of Ulta's actual practices;

    D.    Whether Plaintiffs and the Class members have been damaged and, if so, the measure of such damages;

    E.    Whether Defendants unjustly retained a benefit conferred by Plaintiffs and the Class members; and

    F.    Whether Plaintiffs and the Class members are entitled to equitable relief, including, but not limited to, a constructive trust, restitution, and declaratory and/or injunctive relief.

98.    Plaintiffs' claims are typical of the claims of the Class members because, among other things, Plaintiffs and the Class members were injured through the substantially uniform misconduct described above. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all Class members.

99.    Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members they seek to represent; they have retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiffs intend to prosecute this action vigorously. The interests of the Class members will be fairly and adequately protected by Plaintiffs and their counsel.

100.    A class action is also warranted under Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole. Defendants have directed and continue to direct their conduct to all consumers in a uniform manner. Therefore, injunctive relief on a class-wide basis is necessary to remedy continuing harms to Plaintiffs and the Class members caused by Defendants' continuing misconduct.

101.    A class action is superior to any other available means for the fair and efficient

adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other detriment suffered by Plaintiffs and the Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendants' wrongful conduct.  Even if Class members could afford individual litigation, the court system should not be required to undertake such an unnecessary burden.  Individualized litigation would also create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

### CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Breach of the Implied Warranty of Merchantability**
**(On Behalf of the Nationwide Class or, Alternatively, Each State Subclass)**

102.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 101 as if fully set forth herein.

103.    Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Class or, alternatively, each State Subclass against Defendants.

104.    Ulta is one of the largest retail sellers of beauty products, including cosmetic products.  As a seller of beauty products, Ulta impliedly warranted that all its beauty products were fit for their intended purpose in that they were all new, previously unused by consumers, and were free from adulteration prior to purchase.

105.    In reality, however, Defendants breached the warranty of merchantability implied in every contract for the sale of their beauty products with consumers in that the beauty products

sold were not merchantable at the time of the sale as they could not pass without objection in the trade under the contract description, and that the goods were not of fair, average quality within the description, because they were not all new but rather new products had been comingled with used products.  As a result, Plaintiffs and Nationwide Class members or each State Subclass member did not receive the goods as impliedly warranted by Defendants to be merchantable.

106.    Further, Ulta took affirmative steps to intentionally conceal its actions so that there was no way for consumers to tell which beauty products sold were adulterated due to previous use and which ones were not and comingled the used with the new on the shelf, which was undisclosed to consumers.

107.    Plaintiffs and Nationwide Class members or State Subclass members were the intended beneficiaries of Ulta's implied warranties of merchantability.

108.    In reliance upon Defendants' skill and judgment and the implied warranties, Plaintiffs, Nationwide Class members, and State Subclass members purchased beauty products from Ulta for personal use.

109.    Defendants knew their beauty products would be purchased and used without consumer knowledge that an indeterminate number of their beauty products had been previously used and were thus adulterated.

110.    As a direct and proximate cause of Defendants' breach of the implied warranty of merchantability, Plaintiffs, Nationwide Class, and State Subclass members have been injured and harmed because: (a) they would not have purchased the beauty products on the same terms if the truth concerning Ulta's resale policy had been known; and (b) they paid a price premium due to Ulta's actions as described herein above.

111.    Pursuant to the California Uniform Commercial Code § 2-607(3)(A), Plaintiff

47

Smith-Brown gave Defendant Ulta Beauty, Inc. written notice of Defendants' breach of warranty on January 26, 2018.  *See* Exhibit F, Letter from Janine Pollack to Ulta Beauty, Inc.

112.    Pursuant to various state requirements, Plaintiffs Ilene Anchell, Brittany Caffrey, Valarie Hutchison, Jennifer Sacks, Veronica Sanders, Colleen Thornton, and Alice Vitiello gave Defendant Ulta Beauty, Inc. and Defendant Ulta Salon, Cosmetics & Fragrance, Inc. written notice of Defendants' breach of warranty on March 19, 2018.  *See* Exhibit F, Letter from Janine Pollack to Ulta Beauty, Inc. and Ulta Salon, Cosmetics & Fragrance, Inc.

113.    Pursuant to S.C. Code § 36-2-607, Plaintiff Swaney gave Defendant Ulta Beauty, Inc. and Defendant Ulta Salon, Cosmetics & Fragrance, Inc. written notice of Defendants' breach of warranty on March 23, 2018.  *See* Exhibit F, Letter from Janine Pollack to Ulta Beauty, Inc. and Ulta Salon, Cosmetics & Fragrance, Inc.

114.    Pursuant to Md. Code Ann. § 2-607, Plaintiff Allen gave Defendant Ulta Beauty, Inc. and Defendant Ulta Salon, Cosmetics & Fragrance, Inc. written notice of Defendants' breach of warranty on April 4, 2018.  *See* Exhibit F, Letter from Janine Pollack to Ulta Beauty, Inc. and Ulta Salon, Cosmetics & Fragrance, Inc.

115.    Pursuant to Ind. Code Ann. § 26-1-2-607(3), Plaintiff Jackson gave Defendant Ulta Beauty, Inc. and Defendant Ulta Salon, Cosmetics & Fragrance, Inc. written notice of Defendants' breach of warranty on May 21, 2018.  *See* Exhibit F, Letter from Janine Pollack to Ulta Beauty, Inc. and Ulta Salon, Cosmetics & Fragrance, Inc.

116.    Pursuant to Ala. § 7-2-607(3), 810 ILCS 5/2-607, Nev. Rev. Stat. Ann. § 104.2607(3), R.I. Gen. Laws § 6A-2-607(3), Va. Code Ann. § 8.2-607(3), and Rev. Code Wash. § 62A.2-607(3), Plaintiffs Tammy Walker, Kris Dane, Michelle Musk, Donna Williams, Deanna Shaw, Jessica Tift, and Cristina Kovacs gave Defendant Ulta Beauty, Inc. and Defendant Ulta

Salon, Cosmetics & Fragrance, Inc. written notice of Defendants' breach of warranty on May 23, 2018. *See* Exhibit F, Letter from Thomas A. Zimmerman, Jr. to Ulta Beauty, Inc. and Ulta Salon, Cosmetics & Fragrance, Inc.

117.    Based on the foregoing, Plaintiffs, the Nationwide Class, and each State Subclass have been injured in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On Behalf of the Nationwide Class, or Alternatively, the Each State Subclass)**

118.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 101 as if fully set forth herein.

119.    Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Class or, alternatively, each State Subclass against Defendants.

120.    Defendants have been unjustly enriched to Plaintiffs' and the Nationwide Class or the State Subclass members' detriment as a result of their unlawful and wrongful retention of money conferred by Plaintiffs and the Nationwide Class or the State Subclass members who were unaware of the risk that the beauty products they purchased from Defendants may have been used, such that Defendants' retention of their money would be inequitable.

121.    Defendants' unlawful and wrongful acts, including failing to disclose their resale policy of reselling used beauty products as if they were new and comingling the new with the used, as alleged above, enabled Defendants to unlawfully receive monies they would not have otherwise obtained.

122.    Plaintiffs and the Nationwide Class or the State Subclass members have conferred benefits on Defendants, which Defendants have knowingly accepted and retained.

123.    Defendants' retention of the benefits conferred by Plaintiffs and the Nationwide Class or the State Subclass members would be against fundamental principles of justice, equity, and good conscience.

124.    Plaintiffs and the Nationwide Class or the State Subclass members seek to disgorge Defendants' unlawfully retained profits and other benefits resulting from its unlawful conduct, and seek restitution and rescission for the benefit of Plaintiffs and the Nationwide Class or the State Subclass members.

125.    Plaintiffs and the Nationwide Class or the State Subclass members are entitled to the imposition of a constructive trust upon Defendants, such that their unjustly retained profits and other benefits are distributed equitably by the Court to and for the benefit of Plaintiffs and the Nationwide Class or the State Subclass members.

126.    Based on the foregoing, Plaintiffs and the Nationwide Class and each State Subclass have been injured in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
**Violation of Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-1, *et seq.***
**(By Plaintiff Tammy Walker Individually and on Behalf of the Alabama Subclass)**

127.    Plaintiff Tammy Walker repeats and realleges the allegations set forth in paragraphs 1 through 101 as if fully set forth herein.

128.    Plaintiff Walker brings this action on behalf of herself and the Alabama Subclass against Defendants.   Plaintiff Walker and the Alabama Subclass are "consumers" within the meaning of Ala. Code § 8-19-3(2).

129.    Plaintiff Walker, the Alabama Subclass, and Defendants are "persons" within the meaning of Ala. Code § 8-19-3(5).

50

130.    Beauty products sold by Ulta are "goods" within the meaning of Ala. Code § 8-19-3(3).

131.    Defendants were and are engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

132.    The Alabama Deceptive Trade Practices Act ("ADTPA") declares several specific actions to be unlawful, including: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have; … (6) Representing that goods are original or new if they are deteriorated, reconditioned, reclaimed, used, secondhand, or altered to the point of decreasing their value or rendering the goods unfit for the ordinary purpose for which they were purchased provided that this subdivision shall not apply to new goods which have been reconditioned, reclaimed, or repaired and such fact is disclosed to the purchaser; (7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."  Ala. Code § 8-19-5.

133.    In the course of their business, Defendants concealed and suppressed material facts concerning the resale policy regarding their beauty products. Defendants accomplished this by retouching and repackaging used beauty products and selling them as new thereby concealing their true condition from consumers and failing to disclose same while comingling new and used beauty products.

134.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the ADTPA by failing to disclose and actively concealing material facts regarding their beauty products with intent to mislead Plaintiff Walker and the Alabama Subclass. Plaintiff

51

Walker and the Alabama Subclass had a reasonable belief that all of the products sold by Ulta are new and unused.

135.     Plaintiff Walker and the Alabama Subclass suffered ascertainable loss and actual damages as a direct and proximate result of Ulta's misrepresentations and concealment of and failure to disclose material information.  If Defendants had disclosed their resale policy, Plaintiff Walker and the Alabama Subclass members who purchased Ulta's beauty products would not have purchased them at all or would have paid less for them.

136.     As a direct and proximate result of Defendants' violations of the ADTPA, Plaintiff Walker and the Alabama Subclass have suffered injury in fact and/or actual damage.

137.     Pursuant to Ala. Code § 8-19-10(a)(1), Plaintiff Walker and the Alabama Subclass seek monetary relief against Defendants measured as the greater of either actual damages in an amount to be determined at trial or statutory damages in the amount of $100 for Plaintiff Walker and each Alabama Subclass member.

138.     Plaintiff Walker and the Alabama Subclass also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Ala. Code § 8-19-1, *et seq*.

139.     On May 23, 2018, Plaintiff Walker sent a letter complying with Ala. Code § 8-19-10(e).  Because Ulta failed to remedy its unlawful conduct within the requisite time period, Plaintiff Walker seeks all damages and relief to which Plaintiff Walker and the Alabama Subclass are entitled.

**FOURTH CLAIM FOR RELIEF**
**Violation of California Unfair Competition Law ("UCL"),**
**California Business & Professions Code § 17200, *et seq*.**
**(By Plaintiffs Kimberley Laura Smith-Brown and Robin Okman Individually and on Behalf of the California Subclass)**

140.     Plaintiffs Kimberley Laura Smith-Brown and Robin Okman repeat and reallege the allegations set forth in paragraphs 1 through 101 as if fully set forth herein.

141.     As defined in Cal. Bus. & Prof. Code § 17200, *et seq.*, the UCL prohibits "any unlawful, fraudulent, or unfair business act or practice and any false or misleading advertising."

142.     Plaintiffs Smith-Brown and Okman and the California Subclass had a reasonable belief that all of the products sold by Ulta are new and unused.

143.     In the course of conducting business, Defendants committed unlawful business practices by, among other things, making representations and omitting material facts regarding the resale policy for the beauty products they sell, that all the products on their store shelves were unused when in fact previously used products were routinely reshelved without any disclosure to Ulta shoppers, including Plaintiffs Smith-Brown and Okman and the California Subclass. Defendants' business practices, as described herein, were also unlawful under the UCL by virtue of their violations of the Consumers Legal Remedies Act, as described *infra*.

144.     Defendants' conduct constituted a fraudulent business practice in that it was likely to deceive the public as described in this Complaint and did, in fact, deceive the public, Plaintiffs Smith-Brown and Okman, and members of the California Subclass.

145.     Defendants' conduct is unfair and offends an established public policy. Further, Defendants engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

146.     There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

147.     Plaintiffs Smith-Brown and Okman and the California Subclass relied on Defendants' deceptive practices and omissions, as described *supra*. Plaintiffs Smith-Brown and

Okman and the California Subclass have suffered injury in fact and lost money as a result of Defendants' unlawful, unfair, and fraudulent practices. Plaintiffs Smith-Brown and Okman and the California Subclass would not have purchased Ulta's beauty products or would have paid less for them had they known that Ulta engaged in a widespread practice of selling used returned product and representing it as "new."

148. Unless restrained and enjoined, Defendants will continue to engage in the above-described conduct in violation of Cal. Bus. & Prof. Code §17200 *et seq.*, entitling Plaintiffs Smith-Brown and Okman and the other California Subclass members to injunctive relief. If Defendants continue to engage in the violations of the UCL as described above, Plaintiffs Smith-Brown and Okman and the other California Subclass members will likely be deceived in the future when they shop for Defendants' products, not knowing the true facts.

149. Based on the foregoing, Plaintiffs Smith-Brown and Okman and the California Subclass have been injured in an amount to be determined at trial.

<u>**FIFTH CLAIM FOR RELIEF**</u>
**California Consumers Legal Remedies Act**
**Cal. Civ. Code § 1750 *et seq.***
**(By Plaintiffs Kimberley Laura Smith-Brown and Robin Okman Individually and on Behalf of the California Subclass)**

150. Plaintiffs Kimberley Laura Smith-Brown and Robin Okman repeat and reallege the allegations set forth in paragraphs 1 through 101 as if fully set forth herein.

151. Plaintiffs Smith-Brown and Okman and members of the California Subclass are "consumers" within the meaning of Cal. Civ. Code §§ 1761(d) and 1770, and each has engaged in a "transaction" within the meaning of Cal. Civ. Code §§ 1761(e) and 1770.

152. Defendants are "person[s]" within the meaning of Cal. Civ. Code §§ 1761(c) and 1770, and provided "goods" within the meaning of Cal. Civ. Code §§ 1761(a) and 1770.

153.    Ulta's acts and practices, as alleged in this Complaint, violate California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1770(a)(5), (6) and (7), because Ulta engaged in unfair methods of competition and unfair and deceptive acts and practices in connection with transactions, namely, the policy of resale of used beauty products altered to appear as new without disclosure of same.  This conduct was intended to result, and did result, in the sale of these goods to consumers.  Specifically, Ulta:

      A.    Represented that Ulta's beauty products had approval or characteristics that they did not have;

      B.    Represented that Ulta's beauty products were original or new if they were deteriorated unreasonably, or were altered, reconditioned, reclaimed, used, or secondhand; and

      C.    Represented that Ulta's beauty products were of a particular standard, quality or grade when they were actually of another.

154.    Ulta was in a position to know and did in fact know, by its own conduct, that the used beauty products were being affirmatively altered in order to appear as new when resold and that it had not disclosed to its customers, including Plaintiffs Smith-Brown and Okman and the California Subclass, that it was retouching and reselling used unsanitary beauty products and in such a way that they were comingled with new products.  Plaintiffs Smith-Brown and Okman and the California Subclass had a reasonable belief that all of the products sold by Ulta are new and unused.

155.    Ulta intended that Plaintiffs Smith-Brown and Okman and the California Subclass members would rely on the false and misleading practices and omissions, and any reasonable consumer would deem the false and misleading practices and omissions material to the purchase of the affected products.

156.    As a direct and proximate result of Ulta's conduct, Plaintiffs Smith-Brown and Okman and the California Subclass members have been harmed, in that they purchased beauty products from Ulta that they otherwise would not have, or paid more for the beauty products from Ulta than they otherwise would have.  Meanwhile, Ulta has generated more revenue than it otherwise would have, unjustly enriching itself.

157.    Plaintiffs Smith-Brown and Okman and the California Subclass are entitled to equitable relief, reasonable attorneys' fees and costs, declaratory relief, and a permanent injunction enjoining Ulta from its unlawful, fraudulent, and deceitful activity.

158.    Pursuant to Cal. Civ. Code § 1782(a), Plaintiff Smith-Brown sent Ulta Beauty, Inc. a letter on behalf of herself and a proposed nationwide class of consumers on January 26, 2018, demanding that Ulta rectify the problems listed herein.  Ulta has failed to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within the proscribed 30-day time period for written notice pursuant to Cal. Civ. Code § 1782. *See* Exhibit F, Letter from Janine Pollack to Ulta Beauty, Inc.

159.    Due to Ulta failing to rectify or otherwise agreeing to rectify the problems associated with the actions detailed above, Plaintiffs Smith-Brown and Okman seek to further recover actual or statutory compensatory/monetary damages as authorized by Cal. Civ. Code § 1780(a)(1), restitution as applicable and authorized under Cal. Civ. Code § 1780(a)(3), and punitive damages as authorized by Cal. Civ. Code § 1780(a)(4), which are appropriate in this case in light of Ulta's knowing, intentional, fraudulent, and unconscionable conduct, as well as Ulta's reckless disregard of its legal obligations to Plaintiffs Smith-Brown and Okman and the California Subclass members, and as otherwise recoverable under Cal. Civ. Code § 1780(a)(4).

160.    Based on the foregoing, Plaintiffs Smith-Brown and Okman and the California Subclass have been injured in an amount to be determined at trial.

### SIXTH CLAIM FOR RELIEF
**Violation of Illinois Consumer Fraud and Deceptive Business Practices Act,**
**815 ILCS 505/1 *et seq.***
**(By Plaintiffs Paula Ogurkiewicz, Colleen Thornton, and Cristina Kovacs Individually and**
**on Behalf of the Illinois Subclass)**

161.    Plaintiffs Paula Ogurkiewicz, Colleen Thornton, and Cristina Kovacs repeat and reallege the allegations set forth in paragraphs 1 through 101 as if fully set forth herein.

162.    Plaintiffs Paula Ogurkiewicz, Colleen Thornton, and Cristina Kovacs bring this claim individually and on behalf of the members of the Illinois Subclass against Defendants.

163.    The Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"), 815 ILCS 505/1, *et seq*., prohibits the use of unfair or deceptive business practices in the conduct of trade or commerce.

164.    Defendants are "persons" pursuant to 815 ILCS 505/1(c).

165.    Plaintiffs Orgurkiewicz, Thornton, and Kovacs and Illinois Subclass members are "consumers" pursuant to 815 ILCS 505/1(e).

166.    Defendants' conduct in failing to disclose their resale policy that they were, in fact, selling used products comingled with new constitutes "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact," made "with intent that others rely upon the concealment, suppression, or omission of such material fact or the use or employment of any [such] practice." *See* 815 ILCS 505/2.  Therefore, Defendants' conduct constitutes "unfair or deceptive acts" in the course of trade or commerce.  *See id.*

167.    Ulta intended that Plaintiffs Ogurkiewicz, Thornton and Kovacs and each member

of the Illinois Subclass would rely upon its deceptive conduct, and Plaintiffs and the Illinois Subclass relied on Defendants' deceptive conduct in believing that they were purchasing only new, unused beauty products.

168.     Plaintiffs Orgurkiewiz, Thornton, and Kovacs, and members of the Illinois Subclass would not have purchased Ulta's beauty products or would have paid less for them had they known that Ulta engaged in a widespread practice of selling used returned product and representing it as new.

169.     Plaintiffs Ogurkiewicz, Thornton, and Kovacs, and members of the Illinois Subclass have been directly and proximately damaged by Ulta's actions in that they paid more for products than they would have had they known the truth about Ulta's practices and resale policy.

170.     In addition, Ulta's conduct showed malice, motive, and a reckless disregard of the truth such that an award of punitive damages is appropriate.

171.     Based on the foregoing, Plaintiffs Ogurkiewicz, Thornton, and Kovacs and the Illinois Subclass have been injured in an amount to be determined at trial.

## **SEVENTH CLAIM FOR RELIEF**
### **Violation of the Florida Deceptive and Unfair Trade Practices Act,**
### **Fla. Stat. § 501.201 *et seq.***
### **(By Plaintiff Ilene Anchell Individually and on Behalf of the Florida Subclass)**

172.     Plaintiff Ilene Anchell hereby incorporates by reference the allegations contained in paragraphs 1 through 101 of this complaint.

173.     This claim is brought by Plaintiff Anchell on behalf of Florida purchasers who are members of the Florida Subclass.

174.     Plaintiff Anchell and other Florida Subclass members are "consumers" within the meaning of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.203(7).

175.    Defendants engaged in "trade or commerce" within the meaning of Fla. Stat.§ 501.203(8).

176.    Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). Defendants participated in unfair and deceptive trade practices that violated the FDUTPA as described herein.

177.    In the course of their business, Defendants concealed and suppressed material facts concerning their resale policy for their beauty products. Defendants accomplished this by retouching and repackaging used beauty products and selling them as new thereby concealing their true condition from consumers and comingling the old with the new.  Plaintiff Anchell and the Florida Subclass reasonably believed that all products sold by Ulta were new and unused.

178.    The facts concealed and omitted by Defendants from Plaintiff Anchell and the other Florida Subclass members were and are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Ulta's beauty products. Had Plaintiff Anchell and the other Florida Subclass members known that Ulta routinely sold used beauty products as new while comingling used with new on the shelf at the time they purchased Ulta beauty products they would not have made such purchases or they would have paid less for them.

179.    Based on the foregoing, Plaintiff Anchell and the Florida Subclass have suffered actual damages in an amount to be determined at trial.

## EIGHTH CLAIM FOR RELIEF
### Violation of The Georgia Fair Business Practices Act,
### Ga. Code Ann. § 10-1-390 *et seq.*
### (By Plaintiff Veronica Sanders Individually and on Behalf of the Georgia Subclass)

180.    Plaintiff Veronica Sanders hereby incorporates by reference the allegations contained in paragraphs 1 through 101 of this complaint.

181.    The Georgia Fair Business Practices Act declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another"; and "[a]dvertising goods or services with intent not to sell them as advertised." Ga. Code Ann. § 10- 1-393(b).

182.    Plaintiff Sanders and Georgia Subclass members are "consumers" within the meaning of Ga. Code Ann. § 10-1-393(b).

183.    Defendants violated the Georgia Fair Business Practices Act by failing to disclose their resale policy for their beauty products, as described herein.

184.    Plaintiff Sanders and the Georgia Subclass were injured as a direct and proximate result of Defendants' violation of the Georgia Fair Business Practices Act in that they paid more for products purchased at Ulta than they would have had they known that Ulta sold used beauty products as new and comingled them.  Plaintiff Sanders and the Georgia Subclass reasonably believed that all products sold by Ulta were new and unused.

185.    Plaintiff Sanders will seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia Fair Business Practices Act per Ga. Code Ann. § 10-1-399.

186.    On March 19, 2018, Plaintiff Sanders sent a letter complying with Ga. Code Ann.

§ 10- 1-399(b) to Defendants.  *See* Ex. F.

187.    Based on the foregoing, Plaintiff Sanders and the Georgia Subclass have been

injured in an amount to be determined at trial.

### NINTH CLAIM FOR RELIEF
**Violation Of The Georgia Uniform Deceptive Trade Practices Act,**
**Ga. Code Ann § 10-1-370** *et seq.*
**(By Plaintiff Veronica Sanders Individually and on Behalf of the Georgia Subclass)**

188.    Plaintiff Sanders hereby incorporates by reference the allegations contained in the

paragraphs 1 through 101 of this complaint.

189.    This claim is brought by Plaintiff Sanders on behalf of Georgia purchasers of

Ulta's products. Plaintiff Sanders and Georgia Subclass members are "persons" within the

meaning of Ga. Code Ann. § 10-1-371(5).

190.    Georgia's Uniform Deceptive Trade Practices Act ("GUDTPA") prohibits

"deceptive trade practices," which include "representing that goods or services have sponsorship,

approval, characteristics, ingredients, uses, benefits, or quantities that they do not have";

"[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are

of another"; "[r]epresent[ing] that goods are original or new if they are deteriorated, altered,

reconditioned, reclaimed, used or secondhand"; and "[a]dvertising goods or services with intent

not to sell them as advertised." Ga. Code Ann. § 10-1-393(b); Ga. Code Ann. § 10-1-372(6).

191.    Ulta violated the GUDPTA by failing to disclose it had a resale policy pursuant to

which it regularly sold used products as new and comingled the old with the new.  Plaintiff

Sanders and the Georgia Subclass reasonably believed that all products sold by Ulta were new

and unused.

192.    Plaintiff Sanders and the Georgia Subclass seek an order enjoining Defendants'
unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief
available under Ga. Code Ann. § 10-1-373.

**TENTH CLAIM FOR RELIEF**
**Violation Of The Indiana Deceptive Trade Practices Act,**
**Ind. Code Ann § 24-5-0.5-2 *et seq.***
**(By Plaintiff Kristen Jackson Individually and on Behalf of the Indiana Subclass)**

193.    Plaintiff Jackson hereby incorporates by reference the allegations contained in the
paragraphs 1 through 101 of this complaint.

194.    This claim is brought by Plaintiff Jackson on behalf of Indiana purchasers of
Ulta's products. Plaintiff Jackson and Indiana Subclass members are "persons" within the
meaning of Ind. Code Ann. § 24-5-0.5-2.

195.    As described *supra*, Defendants' actions are "incurable deceptive acts" within the
meaning of Ind. Code Ann. § 24-5-0.5(2)(8) in that they were intended to mislead consumers.

196.    Indiana's Deceptive Trade Practices Act ("IDTPA") prohibits "deceptive acts,"
which include representing "[t]hat such subject of a consumer transaction is new or unused, if it
is not and if the supplier knows or should reasonably know that it is not." Ind. Code Ann. § 24-5-
0.5-3(b)(3).

197.    Ulta violated the IDPTA by failing to disclose it had a resale policy pursuant to
which it regularly sold used products in such a way as to deceive or mislead customers into
believing they were new and comingled the old with the new.  Plaintiff Jackson and the Indiana
Subclass reasonably believed that all products sold by Ulta were new and unused.

198.    As described *supra*, Defendants' actions were willful.

199.    Plaintiff Jackson and the Indiana Subclass seek damages up to the amount of
treble damages or $1,000 per occurrence, whichever is greater; an order enjoining Defendants'

62

unfair, unlawful, and/or deceptive practices; reasonable attorneys' fees; and any other just and proper relief available under Ind. Code Ann. § 24-5-0.5-4.

## ELEVENTH CLAIM FOR RELIEF
### Violations of The Maryland Consumer Protection Act,
### Unfair Or Deceptive Trade Practices, Md. Code, Com. Law § 13-301 *et seq.*
### (By Plaintiff Quinn Allen Individually and on Behalf of the Maryland Subclass)

200.     Plaintiff Quinn Allen hereby incorporates by reference the allegations contained in all paragraphs 1 through 101 of this Complaint as though set forth fully herein.

201.     Plaintiff Allen asserts this cause of action on behalf of herself and the Maryland Subclass.

202.     Plaintiff Allen and the Maryland Subclass members are "Consumers" as defined by the Maryland Consumer Protection Act § 13-101(c).

203.     Ulta is a "Merchant" as defined by the Maryland Consumer Protection Act § 13-101(g).

204.     Plaintiff Allen and members of the Maryland Subclass are consumers who purchased Ulta's products for personal, family or household use.

205.     The Maryland Consumer Protection Act declares unlawful the following: "(1) [f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;" and any representation that: "(iii) [d]eteriorated, altered, reconditioned, reclaimed, or secondhand consumer goods are original or new; or that (iv) [c]onsumer goods, consumer realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not..." Md. Code, Com. Law § 13-301.

206.     Ulta failed to disclose it had a widespread practice of reselling used products as new, which had been returned by other customers and comingled on the shelves at Ulta stores.

Ulta's omissions and deceptive practices were material to the purchases by Plaintiff Allen and the Maryland Subclass.

207.    Defendants failed to truthfully disclose to customers the true nature of their resale policy for their beauty products of which they were aware and which was not readily discoverable by consumers.  As a result, Plaintiff Allen and the other Maryland Subclass members were induced to purchase Ulta's products. The facts that Defendants concealed were solely within their possession. Defendants intended that Plaintiff Allen and all Maryland Subclass members rely on the acts of concealment and omissions, so that they would purchase Ulta beauty products.

208.    Defendants' actions led Plaintiff Allen and the members of the Maryland Subclass to suffer an identifiable loss, insofar as they paid more for such products then they would have had they been properly advertised for sale as used.  Plaintiff and the Maryland Subclass relied on Defendants' representation that their products were new and unused.

209.    Pursuant to Md. Code, Com. Law. § 13-408, Plaintiff and the Maryland Subclass seek actual damages and reasonable attorneys' fees.

210.    Based on the foregoing, Plaintiff Allen and the Maryland Subclass have been injured in an amount to be determined at trial.

**TWELFTH CLAIM FOR RELIEF**
**Violation of The Michigan Consumer Protection Act, Mich. Comp. Laws § 445.903 *et seq*.**
**(By Plaintiff Jennifer Sacks Individually and on Behalf of the Michigan Subclass)**

211.    Plaintiff Jennifer Sacks hereby incorporates by reference the allegations contained in paragraphs 1 through 101 of this complaint.

212.    This claim is brought by Plaintiff Sacks on behalf of Michigan purchasers who are members of the Michigan Subclass.

213.     The Michigan Consumer Protection Act ("MCPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including, "representing that goods are new if they are...used"; "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer"; "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is"; or "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903.

214.     Plaintiff Sacks and Michigan Subclass members are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

215.     Ulta is a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

216.     In the course of their business, Defendants intentionally concealed and suppressed material facts concerning the resale policy for their beauty products. Defendants accomplished this by retouching and reselling used beauty products at prices as if they were new and comingling the used with the new on the shelf.  Defendants never disclosed such practices and Plaintiff Sacks and the Michigan Subclass reasonably believed that all products sold by Ulta were new and unused, when in fact used products were comingled with the new.

217.     The facts concealed and omitted by Defendants from Plaintiff Sacks and the other Michigan Subclass members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Ulta's products.  Had Plaintiff Sacks and

the other Michigan Subclass members known of Ulta's resale policy they would not have purchased the products or would have paid less for them.

218.    Plaintiff Sacks and the Michigan Subclass seek injunctive relief to enjoin Defendants from continuing their unfair and deceptive acts; actual damages; and any other just and proper relief available under Mich. Comp. Laws § 445.911, as well as rescission.

219.    Based on the foregoing, Plaintiff Sacks and the Michigan Subclass have been injured in an amount to be determined at trial.

**THIRTEENTH CLAIM FOR RELIEF**
**Violation of the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1 *et seq*.**
**(By Plaintiff Allison Sot Individually and on Behalf of the New Jersey Subclass)**

220.    Plaintiff Allison Sot hereby incorporates by reference the allegations contained in paragraphs 1 through 101 of this complaint.

221.    The New Jersey Consumer Fraud Act (the "NJCFA"), codified at N.J. Stat. § 56:8, declares unlawful the "act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false promise, misrepresentation, or the knowing, concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise...whether or not any person has in fact been misled, deceived or damaged thereby...".

222.    Under the NJCFA, "merchandise" means "any objects, wares, goods, commodities, services, or anything offered, directly or indirectly, to the public for sale." N.J. Stat. § 56:8-1(c).

223.    In the course of business, Defendants omitted to disclose their resale policy for their beauty products in that all Defendants were retouching used beauty products and placing

them on the shelf for resale to appear as new, and comingling the new with the used.

224.    Defendants undertook this action is such a way as to make the used beauty products appear as new to consumers with the intent that Ulta customers rely on Defendants'decepetive conduct and omissions of material facts.  Plaintiff Sot and the New Jersey Subclass reasonably believed that all products sold by Ulta were new and unused.

225.    Defendants' failure to disclose which beauty products were used and their active concealment of the nature of the used beauty products was material to Plaintiff Sot and the New Jersey Subclass.

226.    Plaintiff Sot and members of the New Jersey Subclass suffered an ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of Defendants' resale policy, Plaintiff Sot and members of the New Jersey Subclass would not have purchased these products or would have paid less for them.

227.    As a direct and proximate result of Defendants' violations of the NJCFA, Plaintiff Sot and the New Jersey Subclass have suffered an ascertainable loss.

228.    Based on the foregoing, Plaintiff Allison Sot and the New Jersey Subclass have been injured in an amount to be determined at trial, including attorneys' fees and costs, as well as injunctive relief enjoining Defendants' unfair and deceptive practices, and any other just and proper relief under N.J. Stat. § 56:8-2.11-2.12 and N.J. Stat. § 4:32-2(h).

## FOURTEENTH CLAIM FOR RELIEF
### Violation of The Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903 *et seq.* (By Plaintiff Kris Dane Individually and on Behalf of the Nevada Subclass)

229.    Plaintiff Kris Dane hereby incorporates by reference the allegations contained in paragraphs 1 through 101 of this complaint.

230.    The Nevada Deceptive Trade Practices Act ("NDTPA"), Nev. Rev. Stat. §

598.0903, *et seq*. prohibits deceptive trade practices. Nev. Rev. Stat. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "5. Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith;" "6. Represents that goods for sale or lease are original or new if he or she knows or should know that they are deteriorated, altered, reconditioned, reclaimed, used or secondhand;" "7. Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model"; "9. Advertises goods or services with intent not to sell or lease them as advertised"; or "15. Knowingly makes any other false representation in a transaction."

231. In the course of their business, Defendants concealed and suppressed material facts concerning their resale policy of Ulta's beauty products. Defendants accomplished this by retouching and reselling used beauty products and comingling the used with the new thereby concealing their true condition, a fact never disclosed to consumers. Plaintiff Dane and the Nevada Subclass reasonably believed that all products sold by Ulta were new and unused.

232. Defendants thus violated the NDTPA by, at minimum, omitting to disclose information that Ulta's beauty products have characteristics, uses, benefits, and qualities which they do not have.

233. Ulta's actions as set forth above occurred in the conduct of trade or commerce.

234. Ulta intentionally and knowingly omitted material facts regarding its beauty products with intent to mislead Plaintiff Dane and the Nevada Subclass.

68

235.    Ulta knew or should have known that its conduct violated the NDTPA.

236.    Given that Defendants only purport to sell new and unused beauty products, they owed Plaintiff Dane and the Nevada Subclass a duty to disclose the illegality and public health and safety risks of selling used beauty products.

237.    Plaintiff Dane and the Nevada Subclass suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' deceptive conduct and their concealment of and failure to disclose material information.  If Plaintiff Dane and the Nevada Subclass members had been informed about Ulta's resale policy, they would not have purchased the products at all, or would have paid less for them.

238.    Defendants' violations present a continuing risk to Plaintiff Dane, the Nevada Subclass, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

239.    As a direct and proximate result of Defendants' violations of the NDTPA, Plaintiff Dane and the Nevada Subclass have suffered injury in fact and/or actual damage. Accordingly, Plaintiff Dane and the Nevada Subclass seek their actual damages, punitive damages, an order enjoining Ulta's deceptive acts or practices, costs of Court, attorneys' fees, and all other appropriate and available remedies under the Nevada Deceptive Trade Practices Act.  Nev. Rev. Stat. § 41.600.

**SIXTEENTH CLAIM FOR RELIEF**
**Violation of The New York Gen. Bus. Law § 349**
**(For Deceptive Acts and Practices And False Advertising)**
**(By Plaintiff Colleen Thornton Individually and on Behalf of the New York Subclass)**

240.    Plaintiff Colleen Thornton hereby incorporates by reference the allegations contained in the paragraphs 1 through 101 of this complaint.

241.     Ulta engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce and furnishing of services within the state of New York, in violation of N.Y. Gen. Bus. Law § 349(a).

242.     Ulta engaged in deceptive, unfair, and unlawful consumer-oriented trade acts and practices by concealing its widespread practice of reselling used cosmetics as new to Plaintiff Thornton and New York Subclass.

243.     In making these material omissions to prospective customers while knowing such representations to be false, Defendants have knowingly and intentionally concealed material facts and breached their duty not to do so.

244.     Plaintiff Thornton and the New York Subclass as well as members of the public were deceived by and relied upon Defendants' affirmative failures to disclose.

245.     Such acts by Defendants are and were deceptive acts or practices which are and/or were likely to mislead a reasonable consumer purchasing Ulta's products. Said deceptive acts and aforementioned practices are material. The sale and distribution in New York of Ulta's products was and is a consumer-oriented act and thereby falls under the New York consumer fraud statute, N.Y. Gen. Bus. Law § 349.

246.     A causal relationship exists between Defendants, unlawful conduct and the ascertainable losses suffered by Plaintiff Thornton.   As a direct and proximate result of Defendants' deceptive trade practices, Plaintiff Thornton and New York Subclass members suffered injury and/or damages.

247.     Defendants' wrongful conduct caused Plaintiff Thornton and the New York Subclass to suffer an ascertainable loss by causing them to incur substantial expense in purchasing beauty products which they reasonably believed would all be new and unused when

in fact Ulta had a policy of reshelving beauty products that had already been used by other customers and had been comingled with new products on the shelves of Ulta's stores, which Ulta never disclosed. Plaintiff Thornton and the New York Subclass have suffered an ascertainable loss by receiving less than what was promised. If Plaintiff Thornton and the New York Subclass members had been informed about Ulta's resale policy, they would not have purchased the products at all, or would have paid less for them.

248.    Plaintiff Thornton and the New York Subclass members seek relief under N.Y. Gen. Bus. Law § 349(h), including, but not limited to, actual damages, treble damages, statutory damages, injunctive relief, and attorneys' fees and costs.

249.    Based on the foregoing, Plaintiff Thornton and the New York Subclass have been injured in an amount to be determined at trial.

### SEVENTEENTH CLAIM FOR RELIEF
**Violation of The Ohio Consumer Sales Practices Act,**
**Ohio Rev. Code Ann. § 1345.01 *et seq.***
**(By Plaintiff Alice Vitiello Individually and on Behalf of the Ohio Subclass)**

250.    Plaintiff Alice Vitiello hereby incorporates by reference the allegations contained in paragraphs 1 through 101 of this complaint.

251.    This claim is brought by Plaintiff Vitiello on behalf of Ohio purchasers of Ulta products who are members of the Ohio Subclass.

252.    Ohio Consumer Sales Practices Act ("OCSPA"), Ohio Rev. Code Ann. § 1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Specifically, and without limitation of the broad prohibition, the OCSPA prohibits a supplier from representing, *inter alia*: "[t]hat the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not" or "[t]hat the subject of a consumer transaction is new, or unused, if it is not." Ohio Rev. Code Ann. § 1345.02(2-3).

253.     Ulta is a "supplier" as that term is defined in Ohio Rev. Code Ann. § 1345.01(C).

254.     Plaintiff Vitiello and Ohio Subclass members are "consumers" as that term is defined in Ohio Rev. Code Ann. § 1345.01(D), and their purchase of Ulta's products is a "consumer transaction" within the meaning of Ohio Rev. Code Ann. § 1345.01(A).

255.     In the course of their business, Defendants concealed and suppressed material facts concerning their resale policy for their beauty products. Defendants accomplished this by retouching and presenting for resale used products as if they were new and comingling the used with the new, a fact never disclosed. The facts concealed and omitted by Defendants from Plaintiff Vitiello and the other Ohio Subclass members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase Ulta's cosmetics. Had Plaintiff Vitiello and the other Ohio Subclass members known of Ulta's resale policy, they would not have purchased such products or would have paid less for them. Plaintiff Vitiello and the Ohio Subclass reasonably believed that all products sold by Ulta were new and unused.

256.     The acts of Ulta constitute "[u]nconscionable consumer sales acts or practices" as defined in Ohio Revised Code, R.C. 1345.03.

257.     As a result of the foregoing wrongful conduct, Plaintiff Vitiello and the other Ohio Subclass members have been damaged in an amount to be proven at trial and seek all just and proper remedies, including but not limited to actual economic damages and an order enjoining Defendants' deceptive and unfair conduct and reasonable attorneys' fees. Ohio Rev. Code. § 1345(E)(F).

258.    Further, Ulta's actions (in such a way as to invalidate OAC Ann. 109:4-3-0S(C) as a defense) specifically violate Ohio Administrative Code, O.A.C. 109:4-3-08, entitled "New for used" which provides:

> Except as provided for in paragraphs (C) and (D) of this rule, it shall be a deceptive act or practice in connection with a consumer transaction for a supplier to represent, directly or indirectly, that an item of goods, or that any part of an item of goods, is new or unused when such is not the fact, to misrepresent the extent of previous use thereof, or to fail to make clear and conspicuous disclosure, prior to time of offer, to the consumer or prospective consumer that an item of goods has been used.

259.    On March 19, 2018, Plaintiff Vitiello sent a letter to Ulta complying with Ohio Revised Code, R.C. 1345.092. *See* Exhibit F.

260.    Based on the foregoing, Plaintiff Vitiello and the Ohio Subclass have been injured in an amount to be determined at trial

### EIGHTEENTH CLAIM FOR RELIEF
**Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law,
73 PS §201 *et seq.***
**(By Plaintiffs Brittany Caffrey and Karen Eonta Individually and on Behalf of The
Pennsylvania Subclass)**

261.    Plaintiffs Brittany Caffrey and Karen Eonta hereby incorporate by reference the allegations contained in paragraphs 1 through 101 of this complaint.

262.    Ulta, Plaintiffs Caffrey and Eonta, and the Pennsylvania Subclass are "[p]erson[s]" within the meaning of Pennsylvania Unfair Practices and Consumer Protection Law (the "UTPCPL") 73 PS §201-2, *et seq.*

263.    The Pennsylvania UTPCPL declares unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce …."

264.    The UTPCPL at  73 P.S. § 201-2, prohibits the following conduct:

> (vi) Representing that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used or secondhand; or

73

(vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another.

265.   Ulta engaged in, and continues to engage in, the above-referenced deceptive acts and unfair trade practices in the conduct of business, trade, and commerce by omitting material facts regarding its resale policy for the products it sells.

266.   The acts, omissions and practices of Ulta as alleged herein constituted and continue to constitute, unlawful and unfair business acts and practices within the meaning of Section 201 *et seq*. of the UTPCPL.

267.   Plaintiffs Caffrey and Eonta relied on Defendants' deceptive acts, unfair trade practices, material omissions, which are described above.  Plaintiffs Caffrey and Eonta have suffered injury in fact and lost money as a result of Defendants' unlawful, unfair, and fraudulent practices.

268.   Defendants' wrongful conduct caused Plaintiffs Caffrey and Eonta and the Pennsylvania Subclass to suffer an ascertainable loss by causing them to incur substantial expense in purchasing beauty products which they reasonably believed would all be new and unused when in fact Ulta had a policy of retouching and reshelving beauty products that had already been used by other customers and had been comingled with new products on the shelves of Ulta's stores. Plaintiffs Caffrey and Eonta and the Pennsylvania Subclass have suffered an ascertainable loss by receiving less than what was promised. If Plaintiffs Caffrey and Eonta and the Pennsylvania Subclass members had been informed about Ulta's resale policy, they would not have purchased the products at all, or would have paid less for them.

269.   Ulta's actions described herein constitute fraud within the meaning of the UTPCPL § 201 *et seq*, in that it  has failed to disclose its resale policy or that its products contain the defects which it knew or should have known about. Ulta's failure to disclose these defects

was likely to mislead Plaintiffs Caffrey and Eonta and the Pennsylvania Subclass into believing that the products were free from defects when they were not.

270.    Ulta's violations present a continuing risk to Plaintiffs Caffrey and Eonta and the Pennsylvania Subclass, as well as to the general public. Ulta's unlawful acts and practices complained of herein affect the public interest and are highly likely to deceive a substantial portion of the consuming public.

271.    As a direct and proximate result of Ulta's business practices, Plaintiffs Caffrey and Eonta and the Pennsylvania Subclass members suffered injury in fact and lost money or property, because they purchased and paid for products that they otherwise would not have. Plaintiffs Caffrey and Eonta and the Pennsylvania Subclass members are entitled to injunctive relief and attorneys' fees and costs.

272.    Pursuant to Pennsylvania Unfair Trade Practices and Consumer Protection Law § 201-4.1, Plaintiffs Caffrey and Eonta and the Pennsylvania Subclass members seek an order of this Court requiring Ulta to disgorge all ill-gotten gains and awarding Plaintiffs Caffrey and Eonta and Pennsylvania Subclass members full restitution of all monies wrongfully acquired by it by means of such "unlawful" and "unfair" conduct, so as to restore any and all monies to Plaintiffs Caffrey and Eonta and Pennsylvania Subclass members which were acquired and obtained by means of such "unlawful" and "unfair" conduct, and which ill-gotten gains are still retained by Ulta.

273.    Plaintiffs Caffrey and Eonta and the members of the Pennsylvania Subclass are each entitled to treble actual damages of not less than $100, plus reasonable attorneys' fees and costs. 73 P.S. § 201-9.2

## NINTEENTH CLAIM FOR RELIEF
**Violation of The Rhode Island Deceptive Trade Practices Act,**
**R.I. Gen. Laws § 6-13.1 *et seq.***
**(By Plaintiff Michelle Musk Individually and on Behalf of the Rhode Island Subclass)**

274.    Plaintiff Michelle Musk hereby incorporates by reference the allegations contained in paragraphs 1 through 101 of this complaint.

275.    Ulta, Plaintiff Musk, and the Rhode Island Subclass members are "persons" within the meaning of R.I. Gen. Laws § 6-13.1-1(3).

276.    Ulta is engaged in "trade" or "commerce" within the meaning of R.I. Gen. Laws § 6-13.1-1(5).

277.    The Rhode Island Deceptive Trade Practices Act ("RIDTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce" including: "(v) [r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "(vi) [r]epresenting that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand; and if household goods have been repaired or reconditioned, without conspicuously noting the defect that necessitated the repair on the tag that contains the cost to the consumer of the goods;" (vii) "[r]epresenting that goods or services are of a particular standard, quality, or grade …, if they are of another"; (ix) "[a]dvertising goods or services with intent not to sell them as advertised"; "(xiii) [u]sing any other methods, acts or practices which mislead or deceive members of the public in a material respect." R.I. Gen. Laws § 6-13.1-1(6).

278.    In the course of their business, Defendants concealed and suppressed material facts concerning their resale policy for their beauty products. Defendants accomplished this by retouching and reselling used beauty products and selling them comingled with new products thereby concealing their true condition from consumers, a fact they failed to disclose. Plaintiff

Musk and the Rhode Island Subclass reasonably believed that all products sold by Ulta were new and unused.

279.    Defendants thus violated the RIDTPA by, at minimum, engaging in deceptive conduct regarding Ulta's beauty products by conveying they have characteristics, uses, benefits, and qualities which they do not have through Ulta's omissions, as described above.

280.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the RIDTPA by failing to disclose and actively concealing material facts regarding their beauty products with intent to mislead Plaintiff Musk and the Rhode Island Subclass.

281.    Ulta knew or should have known that its conduct violated the Rhode Island DTPA.

282.    Plaintiff Musk and the Rhode Island Subclass suffered ascertainable loss and actual damages as a direct and proximate result of Ulta's concealment of and failure to disclose material information.  If Ulta's resale policy had been disclosed, Plaintiff Musk and the Rhode Island Subclass members who purchased Ulta's beauty products would not have purchased them or would have purchased them at a reduced price.

283.    Defendants' violations present a continuing risk to Plaintiff Musk, the Rhode Island Subclass, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

284.    Plaintiff Musk and the Rhode Island Subclass are entitled to recover the greater of actual damages or $200 per purchase pursuant to R.I. Gen. Laws § 6-13.1-5.2(a). Plaintiff Musk and the Rhode Island Subclass are also entitled to injunctive relief, reasonable attorneys' fees and costs, and punitive damages.

## TWENTIETH CLAIM FOR RELIEF
### Violation of The South Carolina Unfair Trade Practices Act,
### S.C. Code Ann. § 39-5-10 *et seq*.
### (By Plaintiff Shasta Swaney Individually and on Behalf of the South Carolina Subclass)

285.    Plaintiff Shasta Swaney hereby incorporates by reference the allegations contained in paragraphs 1 through 101 of this complaint.

286.    This claim is brought by Plaintiff Swaney and the South Carolina Sublclass who are purchasers of Ulta's products in South Carolina.

287.    The South Carolina Unfair Trade Practices Act ("SCUTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann.§ 39-5-20(a).

288.    Ulta is a "person" under S.C. Code Ann. § 39-5.

289.    In the course of their business, Defendants concealed and suppressed material facts by omitting material facts regarding their resale policy for the products they sell, as set forth more fully herein, that all the products on their store shelves were unused when, in fact, previously used products were routinely re-shelved without any disclosure to the public and comingled with new products. Plaintiff Swaney and the South Carolina Subclass members reasonably believed that all of the products sold by Ulta were new and unused.

290.    Defendants' conduct violates the public interest.

291.    The facts concealed and omitted by Defendants from Plaintiff Swaney and the other South Carolina Subclass members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Ulta's products. Had Plaintiff Swaney and the other South Carolina Subclass members known of Ulta's resale policy and the practices it engaged in with regard thereto, they would not have purchased Ulta's products or would have paid less for them.

292.    Based on the foregoing, Plaintiff Swaney and the South Carolina Subclass have been injured in an amount to be determined at trial.  Pursuant to S.C. Code Ann. § 39-5-140(a), Plaintiff Swaney and the South Carolina Subclass seek monetary relief to recover their economic losses. Because Defendants' actions were willful and knowing, Plaintiff Swaney's and the South Carolina Subclass' damages should be trebled. Plaintiff Swaney and the South Carolina Subclass further seek an order enjoining Defendants' unfair or deceptive acts or practices, S.C. Code Ann. § 1345, and for attorneys' fees and costs.

**TWENTY-FIRST CLAIM FOR RELIEF**
**Violations of The Virginia Consumer Protection Act, Va. Code Ann. §§ 59.1-196 *et seq.***
**(By Plaintiff Donna Williams Individually and on Behalf of the Virginia Subclass)**

293.    Plaintiff Donna Williams hereby incorporates by reference the allegations contained in paragraphs 1 through 101 of this complaint.

294.    Plaintiff Williams brings this action on behalf of herself and the Virginia Subclass against Defendants.

295.     Ulta, Plaintiff Williams, and the Virginia Subclass are "persons" within the meaning of Va. Code § 59.1-198.

296.     Ulta is a "supplier" within the meaning of Va. Code § 59.1-198.

297.    The Virginia Consumer Protection Act ("VCPA") makes unlawful "fraudulent acts or practices."  Va. Code § 59.1-200(A).

298.    Ulta thus violated the Act, at a minimum by: "5. Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;" "6. Misrepresenting that goods or services are of a particular standard, quality, grade, style or model;" 8. Advertising goods or services with intent not to sell them as advertised;"  or "7. Advertising or offering for sale goods that are used, secondhand, repossessed, defective,

blemished, deteriorated, or reconditioned, or that are 'seconds,' irregulars, imperfects, or 'not first class,' without clearly and unequivocally indicating in the advertisement or offer for sale that the goods are used, secondhand, repossessed, defective, blemished, deteriorated, reconditioned, or are 'seconds,' irregulars, imperfects or 'not first class;'" and "14. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Va. Code § 59.1-200(A).

299.    In the course of their business, Defendants concealed and suppressed material facts concerning the resale policy for their beauty products. Defendants accomplished this by retouching and reselling used beauty products and comingling them with new products on the shelves thereby concealing their true condition from consumers, which was nowhere disclosed.

300.    Defendants thus violated the VCPA by, at a minimum, engaging in deceptive conduct regarding Ulta's beauty products by conveying they have characteristics, uses, benefits, and qualities which they do not have through Ulta's omissions, as described above.

301.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the VCPA by failing to disclose and actively concealing and knowingly concealing material facts regarding its beauty products with intent to mislead Plaintiff Williams and the Virginia Subclass.  Plaintiff Willaims and the Virginia Subclass reasonably believed that all products sold by Ulta were new and unused.

302.    Ulta knew or should have known that its conduct violated the VCPA.

303.    Plaintiff Williams and the Virginia Subclass suffered ascertainable loss and actual damages as a direct and proximate result of Ulta's concealment of and failure to disclose material information.  Had Defendants disclosed their resale policy, Plaintiff Williams and the Virginia

Subclass members who purchased Ulta's beauty products would not have purchased them at all or would have purchased them at a reduced price.

304.    Pursuant to Va. Code § 59.1-204(A)–(B), Plaintiff Williams and the Virginia Subclass are entitled to the greater of actual damages or $500 for each Virginia Subclass member, attorneys' fees, and costs. Because Ulta's actions were willful, Plaintiff Williams and the Virginia Class should each receive the greater of treble damages or $1,000.

**TWENTY-SECOND CLAIM FOR RELIEF**
**Violation of the Washington Consumer Protection Act,**
**Wash. Rev. Code Ann. §§ 19.86.010 *et seq.***
**(By Plaintiffs Deanna Shaw and Jessica Tift Individually and on Behalf of**
**the Washington Subclass)**

305.    Plaintiffs Deanna Shaw and Jessica Tift hereby incorporate by reference the allegations contained in paragraphs 1 through 101 of this complaint.

306.    Plaintiffs Shaw and Tift bring this action on behalf of themselves and the Washington Subclass against Defendants.

307.    Defendants, Plaintiffs Shaw and Tift, and the Washington Subclass are "persons" within the meaning of Wash. Rev. Code § 19.86.010(1).

308.    Ulta is engaged in "trade" or "commerce" within the meaning of Wash. Rev. Code § 19.86.010(2).

309.    The Washington Consumer Protection Act ("WCPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Wash. Rev. Code § 19.86.020.

310.    In the course of their business, Defendants concealed and suppressed material facts concerning the resale policy for their beauty products. Defendants accomplished this by retouching and reselling used beauty products and comingling them with new ones thereby concealing their true condition from consumers, which was never disclosed by Ulta. Plaintiffs

Shaw and Tift and the Washington Subclass reasonably believed that all products sold by Ulta were new and unused.

311.     Ulta thus violated the WCPA, at a minimum, by engaging in deceptive conduct regarding Ulta's beauty products by conveying they have characteristics, uses, benefits, and qualities which they do not have through Ulta's omissions, as described above.

312.     Ulta knew or should have known that its conduct violated the WCPA.

313.     Plaintiffs Shaw and Tift and the Washington Subclass suffered ascertainable loss and actual damages as a direct and proximate result of Ulta's concealment of and failure to disclose material information.  Had Defendants disclosed their resale policy, Plaintiffs Shaw and Tift and the Washington Subclass members who purchased Ulta's beauty products would not have purchased them or would have paid less for them.

314.     Pursuant to Wash. Rev. Code § 19.86.090, Plaintiffs Shaw and Tift and the Washington Subclass seek an order enjoining Ulta's unfair and/or deceptive acts or practices, damages, treble damages, and attorneys' fees, costs, and any other just and proper relief available under the WCPA.

### TWENTY-THIRD CLAIM FOR RELIEF
**Violation of Wisconsin Deceptive Trade Practices Act,**
**Wis. Stat. § 100.18 *et seq.***
**(By Plaintiff Valarie Hutchison Individually and on Behalf of the Wisconsin Subclass)**

315.     Plaintiff Valarie Hutchison hereby incorporates by reference the allegations contained in the paragraphs 1 through 101 of this complaint.

316.     This claim is brought by Plaintiff Hutchison on behalf of the Wisconsin Subclass who are purchasers of Defendants' products in Wisconsin.

317.     Wisconsin's Deceptive Trade Practices Act prohibits a person or corporation from disseminating an advertisement in any form to the public which contains a "representation or

statement of fact which is untrue, deceptive or misleading." Wis. Stat.§ 100.18(1) Fraudulent Representations.

318.    Ulta is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

319.    Plaintiff Hutchison and Wisconsin Subclass members are members of "the public" within the meaning of Wis. Stat. § 100.18(1). Plaintiff Hutchison and the Wisconsin Subclass purchased products from Ulta.

320.    In the course of their business, Defendants concealed and suppressed material facts regarding the resale policy for the products they sell to the public, as set forth more fully herein, in that previously used products were routinely retouched and reshelved without disclosure and comingled with new products.  Plaintiff Hutchison and the Wisconsin Subclass reasonably believed that all products sold by Ulta were new and unused.

321.    Defendants' concealments and omissions regarding their beauty products were untrue, deceptive, and misleading. Had Defendants disclosed their resale policy, Plaintiff Hutchison and the Wisconsin Subclass members who purchased Ulta's beauty products would not have purchased them or would have paid less for them.

322.    Defendants' concealments and omissions caused Plaintiff Hutchison and the Wisconsin Subclass to suffer a pecuniary loss.

323.    Based on the foregoing, Plaintiff Hutchison and the Wisconsin Subclass have been injured in an amount to be determined at trial, and are entitled to damages equal to twice their pecuniary loss as well as costs and attorneys' fees as well as for other relief under Wis. Stat. § 100.18(11)(b)(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

A.     Certifying the Class under Federal Rule of Civil Procedure 23, as requested herein;

B.     Awarding Plaintiffs and the Class members damages and/or equitable relief as appropriate;

C.     Awarding Plaintiffs and the Class members declaratory and injunctive relief;

D.     Awarding Plaintiffs and the Class members restitution and disgorgement;

E.     Imposing a constructive trust for the benefit of Plaintiffs and the Class members on the unjustly retained benefits conferred by Plaintiffs and the Class members upon Defendants;

F.     Awarding Plaintiffs and the Class members reasonable attorneys' fees, costs, and expenses; and

G.     Granting such other relief as the Court deems just and appropriate.

## JURY TRIAL DEMAND

Plaintiffs, individually and on behalf of all others similarly situated, hereby requests a jury trial, pursuant to Federal Rule of Civil Procedure 38, on all claims so triable.

DATED: June 6, 2018                     By:  _s/ Janine L. Pollack_____
                                        **WOLF HALDENSTEIN ADLER**
                                          **FREEMAN & HERZ LLP**
                                        Janine L. Pollack
                                        270 Madison Avenue
                                        New York, New York 10016
                                        Tel.: (212) 545-4600

84

Fax: (212) 686-0114
pollack@whafh.com

**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLC**
Carl V. Malmstrom
70 West Madison Street, Suite 1400
Chicago, IL   60602
Tel.: (312) 984-0000
Fax: (312) 212-4401
malmstrom@whafh.com

**MCLAUGHLIN & STERN LLP**
Lee S. Shalov
Wade Wilkinson
Jason S. Giaimo
260 Madison Avenue
New York, New York 10016
Tel.: (212) 448-1100
Fax: (212) 448-0066
lshalov@mclaughlinstern.com
wwilkinson@mclaughlinstern.com
jgiaimo@mclaughlinstern.com

*Interim Class Counsel for Plaintiffs and
the Proposed Classes*

**STULL, STULL & BRODY**
Howard Longman
Melissa R. Emert
6 East 45th Street
New York, NY   10017
Tel:      (212) 687-7230
Fax:      (212) 490-2022
hlongman@ssbny.com
memert@ssbny.com

**ZIMMERMAN LAW OFFICES, P.C.**
Thomas A. Zimmerman, Jr.
Matthew C. De Re
Sharon Harris
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
Tel:      (312) 440-0020
Fax:      (312) 440-4180
tom@attorneyzim.com

matt@attorneyzim.com
sharon@attorneyzim.com

**POMERANTZ LLP**
Gustavo Bruckner
Samuel J. Adams
600 Third Ave.
New York, NY 10016
Tel:    (212) 661-1100
Fax:    (917) 463-1044
gfbruckner@pomlaw.com
sjadams@pomlaw.com

**POMERANTZ LLP**
Louis C. Ludwig
10 S. LaSalle St., Suite 3505
Chicago, IL 60602
Tel:    (312) 377-1181
Fax:    (312) 229-8811
lcludwig@pomlaw.com

*Counsel for Plaintiffs*

whafhch55487