# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| KIMBERLY LAURA SMITH-BROWN, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | No. 18 C 610 |
| v. | ) ) | |
| | ) | Judge Jorge L. Alonso |
| ULTA BEAUTY, INC. and ULTA SALON, COSMETICS & FRAGRANCE, INC., | ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, twenty-two customers of defendants' retail cosmetics stores in eighteen states, bring this putative class action lawsuit, asserting state-law claims of breach of warranty, unjust enrichment, and consumer fraud. Defendants have moved to dismiss. For the following reasons, the motion is granted in part and denied in part.

## I.    BACKGROUND

Defendant Ulta Salon, Cosmetics & Fragrance, Inc. ("Ulta Salon") is a "mass retailer of beauty products," operating retail stores "coast to coast." (2d Am. Compl. ¶¶ 1, 4, ECF No. 91.) It is a wholly owned subsidiary of defendant Ulta Beauty, Inc. ("Ulta Beauty"). Plaintiffs, consumers hailing from eighteen states, purchased cosmetics or beauty products at defendants' stores, only to learn that defendants (collectively, "Ulta") had a practice of reshelving products that had been used and returned by dissatisfied customers. In some cases, plaintiffs noticed shortly after purchase that the products appeared to have been previously used (*Id.* ¶¶ 13, 19-20, 26-27, 33.) In other cases, plaintiffs infer that the products may have been previously used based on the following information about Ulta's business practices.

On January 9, 2018, a former Ulta employee revealed that, when customers returned products after using them, the products were "made to 'look new'—but not sanitized—and put back on the shelf to sell to unsuspecting customers." (*Id.* ¶ 62.) The employee posted her revelations on the microblogging website Twitter, identifying herself by the Twitter handle, "@fatinamxo." She posted pictures of used foundation and lipsticks, which Ulta resold as if new. (*Id.*) She claimed that Ulta even trained its staff members to "restore" products, and managers were careful to keep an eye on products in the "damage bin" to assess whether they could be resold. (*Id.* ¶ 63.) Managers taught employees "how to clean eyeshadow palettes and let it dry [overnight] so it can be repackaged and sold the next day." (*Id.*)

Other Twitter users responded to @fatinamxo's posts by claiming that they too worked at Ulta, and what @fatinamxo reported was consistent with their own experience in various places, including California, Washington, Texas, Florida, Michigan, South Carolina, Wisconsin, and Ohio. (*Id.* ¶¶ 66-68.) One of these Twitter users even claimed to have worked at Ulta store number 1221 in Sherman Oaks, California, the same store where plaintiff Kimberly Laura Smith-Brown routinely shopped. (*Id.* ¶ 70.)

@fatinamxo's Twitter revelations created a "social media frenzy" (*id.* ¶ 66), and news outlets began to pick up the story. A former Ulta manager in Ohio told *Business Insider* that "there was often pressure" on managers "to sell used products":

> Our bosses constantly told us if it looked like it could be sold, put it back out. The company always had a percentage they wanted you to stay below weekly in what we damaged. We would literally get lectured by our boss on our conference calls if our stores were over.

(*Id.* ¶ 71.) Twitter users corroborated this pressure from management above the store level to reduce damaged product and get as much product as possible back on the shelves after it was returned. (*Id.* ¶ 77.)

The Ohio manager told *Business Insider* that products such as mascara and foundation were simply returned to the shelf "because it was difficult to tell if they were used." (*Id.* ¶ 72.) When bottled products such as shampoo or lotions were returned, Ulta employees would clean them, "wipe out the spout and turn the pump cap back down," and then reshelve them. (*Id.*) A former Ulta employee in South Carolina told *Business Insider* that bottled products were put back on the shelf as long as they were at least 80% full when they were returned to Ulta. (*Id.* ¶ 73.)

In the wake of these and other, similar revelations about Ulta on the internet and social media, plaintiffs obtained sworn affidavits from five former Ulta employees—Tammy Geier, Kami Turner, Ella Soto, Laura Hornick, and Michael Fisher—who worked in Ulta stores in Georgia, Tennessee, South Carolina, Florida, and California. (*Id.* ¶ 83.) Fisher, Geier, and Turner, while working as general managers of individual Ulta stores, were trained by regional management, apparently based on pressure from senior management, on how to restore and repackage used makeup and beauty products in order to reduce "shrink," or inventory going to waste. (*Id.* ¶¶ 84-86.) All five former employees were instructed to use returned products as "testers" in their stores, despite the potential to "spread disease and germs to those" who use them. (*Id.* ¶ 87.)

Plaintiffs allege that Ulta's policy of reselling or reusing returned products is "unsanitary and hazardous to the public." (*Id.* ¶ 88.) Many of the plaintiffs allege that they suffered sties, rashes, and irritation due to skin and eye infections after purchasing and using Ulta products. (*Id.* ¶¶ 11-12, 16-18, 23, 25-26, 29-31, 34.) They believe the Ulta products they purchased were, unbeknownst to them, previously used and their use of these unsanitary products caused the infections they suffered.

Plaintiffs seek to represent in this action not only themselves but also (a) a nationwide class consisting of "[a]ll persons in the United States who purchased, other than for resale, beauty products from Ulta Beauty retail locations" (2d Am. Compl. ¶ 93), or alternatively, (b) eighteen state subclasses made up of all persons who purchased Ulta beauty products, other than for resale, in each of the eighteen states plaintiffs represent, namely, Alabama, California, Florida, Georgia, Illinois, Indiana, Maryland, Michigan, Nevada, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, South Carolina, Virginia, Washington, and Wisconsin.

The Second Amended Complaint consists of twenty-three claims for relief: breach of the implied warranty of merchantability, on behalf of the nationwide class or, alternatively, each state subclass; unjust enrichment, on behalf of the nationwide class or, alternatively, each state subclass; and twenty-one claims under twenty-one separate consumer fraud and deceptive business practices statutes in the various states plaintiffs represent, each claim on behalf of the subclass of persons who purchased Ulta products in the state supplying the governing law.

## II.    LEGAL STANDARDS

"A motion under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (internal quotation altered)).

Under federal notice-pleading standards, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* Stated differently, "a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S.at 556). "In reviewing the sufficiency of a complaint under the plausibility standard, [courts must] accept the well-pleaded facts in the complaint as true, but [they] 'need[ ] not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665-66 (7th Cir. 2013) (quoting *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)).

A party "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The requirement that fraud be pleaded with particularity "ensures that plaintiffs do their homework before filing suit and protects defendants from baseless suits that tarnish reputations." *Pirelli Armstrong Tire Corp. Retiree Med. Ben. Trust v. Walgreen Co.*, 631 F.3d 436, 439 (7th Cir. 2011). The requirement is not rigid, and what must be alleged will vary, depending on the facts of the case. *Id.* at 442. The heightened pleading standard applies to all *allegations* of fraud (such as a misrepresentations), not merely *claims* labeled fraud. *Id.* at 447.

"Federal Rule of Civil Procedure 12(b)(1) authorizes the Court to dismiss any claim for which the Court lacks subject-matter jurisdiction, such as lack of standing." *Bohn v. Boiron, Inc.*, No. 11 C 8704, 2013 WL 3975126, at *2 (N.D. Ill. Aug. 1, 2013). In order to establish a justiciable "case or controversy" that provides standing to sue under Article III, § 2 of the United States Constitution, a plaintiff must show the following: (1) he has suffered an injury-in-fact that is both (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as

opposed to merely speculative, that the injury will be redressed by a favorable decision. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Where a defendant seeks dismissal under Rule 12(b)(1) for lack of standing, courts should evaluate the sufficiency of the allegations by "us[ing] *Twombly–Iqbal's* 'plausibility' requirement, which is the same standard used to evaluate facial challenges to claims under Rule 12(b)(6)." *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015). The court takes well-pleaded allegations of the complaint as true unless they are refuted by the defendant in an affidavit. *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010).

## III. STANDING

Defendants challenge plaintiffs' standing in three respects, arguing as follows: (a) plaintiffs lack standing to sue over the purchase of products that were new, not used; (b) plaintiffs lack standing to sue on behalf of class members who did not purchase the same beauty products as plaintiffs did; and (c) plaintiffs lack standing to sue on behalf of class members in other states whose claims will be governed by other states' laws.

### A. Standing—New Products

Defendants argue that plaintiffs have no standing based on any purchase of new, unused products because the purchase of such products did not cause any actual injury. Rather, according to defendants, plaintiffs who purchased new products received exactly what they bargained for.

Plaintiffs generally allege that, during a given time frame, they purchased certain Ulta products that they believed were new at the time, but now believe had been previously used. (*See, e.g.,* 2d Am. Compl. ¶ 15.) Some plaintiffs allege some personalized basis for this belief, generally that they suffered some sort of infection after using an Ulta product (*see, e.g., id.* ¶ 16) or the product showed physical signs of having been used, such as a fingerprint in a jar of lip balm (*id.* ¶

27) or build-up of mascara on a brush (*id.* ¶ 20), or perhaps both (*see, e.g., id.* ¶ 26.). Other plaintiffs apparently believe that they purchased used products based only on the revelations about Ulta's general business practice of reshelving returned product. None of them specifically claims to have bought new products from Ulta. However, some portions of plaintiff's complaint suggest that the commingling of new and used products on Ulta shelves reduced the value of all Ulta products. (2d Am. Compl. ¶¶ 4, 6-7, 92.) In their opposition brief, plaintiffs argue that even if they received new products, they still received less than they bargained for because, had they known of the risk that they might receive a used product that might cause an infection, they would have paid less or even shopped elsewhere. According to plaintiffs, based on this theory, even purchasers of new Ulta products suffered an injury-in-fact that confers standing.

Plaintiffs rely principally on *In re Aqua Dots Products Liability Litigation*, 654 F.3d 748, 751 (7th Cir. 2011), in which the Seventh Circuit recognized that plaintiffs who had unknowingly purchased a dangerously defective toy had asserted an injury-in-fact because they claimed to have suffered a "loss [that was] financial: they paid more for the toys than they would have, had they known of the risks the beads posed to children." But, as defendants correctly explain in reply, *Aqua Dots* is distinguishable because the defect (the toy beads, if ingested, "metabolize[d] into gamma-hydroxybutyric acid (GHB), which can induce nausea, dizziness, drowsiness, agitation, depressed breathing, amnesia, unconsciousness, and death," *id.* at 749) was inherent in the products the plaintiffs purchased; all of the beads posed the same risk of harm, and every purchaser received an inherently dangerous product. In this case, to the extent plaintiffs received new Ulta products, there was no defect or risk of harm in the products they purchased, and therefore no overpayment or injury.

In that respect, this case is similar to *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 968 (7th Cir. 2016), in which the plaintiffs claimed "that the cost of their meals is an injury because they would not have dined at P.F. Chang's had they known of its poor data security." In *dicta*, the Seventh Circuit was "skeptical" that such a claim described an Article III injury. *Id.* The court distinguished *Aqua Dots*, which acknowledged that plaintiffs who claim they would have shopped elsewhere had they known of a safety risk may suffer a "financial injury," but "only where the product itself was defective or dangerous and consumers claim they would not have bought it . . . had they known of the defect." *Lewert*, 819 F.3d at 968. In this case, to the extent plaintiffs or class members purchased new products, it was not the "product itself" (*i.e.*, the one with which they walked out of the store) that was "defective or dangerous," and therefore such purchasers have not suffered an injury-in-fact that confers Article III standing. Plaintiffs do not have standing to assert claims arising out of the purchase of new Ulta products.

### B. Standing—Different Products

Defendants argue that plaintiffs lack standing to assert claims based on Ulta products of a kind that they themselves did not purchase. They do not point to any claims of any of the named plaintiffs that they seek to dismiss on this basis; rather, defendants seem to be anticipating that plaintiffs will attempt to represent unnamed class members who purchased certain kinds of Ulta products that the named plaintiffs did not. Plaintiffs argue that they may do so, relying in part on this Court's decision in *Ulrich v. Probalance, Inc.*, No. 16 C 10488, 2017 WL 3581183, at *6 (N.D. Ill. Aug. 18, 2017) (quoting *Wagner v. Gen. Nutrition Corp.*, No. 16-CV-10961, 2017 WL 3070772, at *5 (N.D. Ill. July 19, 2017)), in which the Court recognized that a plaintiff may have standing to bring claims on behalf of unnamed class members based on products he did not purchase "'so long as the products and the alleged misrepresentations are substantially similar.'"

Based on the present allegations, the Court doubts whether the issue is ripe for resolution at this early stage. *Cf. Ulrich*, 2017 WL 3581183, at *6 (complaint was unclear about whether named plaintiff purchased "one bottle of each of the four Products or four bottles of one Product"). In this case, the issue is better reserved for the class certification stage. But even if it were ripe, the Court tends to agree with plaintiffs that the named plaintiffs can represent any consumer who purchased one of defendants' products believing it was new, but that was actually used, because in any such case the deceptive conduct and harm are essentially the same, even if the damages might differ. *See id.* ("The alleged misrepresentations are the same, they all relate to the Products' quantity of protein, which 'fill[s] the same function' in each Product and is 'used in the same manner' in each Product, and the protein claims are 'inaccurate' in 'the same manner on every' Product.") (quoting *Mednick*, 2014 WL 6474915, at *4). Defendants' motion is denied as to this argument, although they may re-raise the issue at a later stage if the facts support it.

### C. Standing—Class Members in Other States

Defendants argue that plaintiffs lack standing to assert claims on behalf of any class members who may have purchased defendants' products in states where no named plaintiffs did, and whose claims will be governed by the laws of those states, because the named plaintiffs "'must possess the same interest and suffer the same injury shared by all members of the class [they] represent[].'" *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 09 CV 3690, 2013 WL 4506000, at *7-8 (N.D. Ill. Aug. 23, 2013) (quoting *Keele v. Wexler*, 149 F.3d 589, 592-93 (7th Cir. 1998)). Plaintiff responds that this argument is premature at this stage because the appropriate time to resolve the issue is at class certification. *See Block v. Lifeway Foods, Inc.*, No. 17 C 1717, 2017 WL 3895565, at *7 (N.D. Ill. Sep. 6, 2017).

The Court agrees with defendants. Defendants' citation to *Dairy Farmers* is apt, and that decision's reasoning is persuasive. Plaintiffs' only response to *Dairy Farmers* is to attempt to distinguish it as a "multi-district class action composed of separate consolidated actions involving a variety of individualized issues, including tolling of the statute of limitations," but they do not explain—and the Court fails to see—why the distinction matters. In *Dairy Farmers*, 2013 WL 4506000, at *7-8, *see also Dairy Farmers*, 2015 WL 3988488, at *25 (N.D. Ill. Jun. 29, 2015), the Court's analysis was not apparently based on any individualized issues or anything other than the general principle that class representatives and class members must "possess the same interest and suffer the same injury," and the Court fails to see why the same principle does not lead to the same result here.

As for whether the issue is premature at the present stage of the case, it is true that courts have taken different approaches, both procedurally and substantively, toward the issue of a named class representative in one state purporting to represent unnamed class members who reside in other states on claims governed by those other states' laws. *See Liston v. King.com, Ltd.*, 254 F. Supp. 3d 989, 998-1002 (N.D. Ill. 2017) (collecting cases and tracing different approaches). The Court need not unravel this conceptual tangle in this case, however, because no matter which perspective one takes, "there is plainly ample reason at this juncture to question whether [plaintiffs] will be able to pursue claims based on statutory causes of action created by states where [plaintiffs] neither lived nor [were] injured." *Id.* at 1001. As the Seventh Circuit has explained, "[n]o class action is proper unless all litigants are governed by the same legal rules," because "[o]therwise the class cannot satisfy the commonality and superiority requirements" of Rule 23. *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002). "[S]tate laws about theories such as those presented by our plaintiffs differ, and such differences have led" the Seventh Circuit

to hold that "other warranty, fraud, or products liability suits may not proceed" together in a single class that extends across state boundaries. *See id.* (citing *Isaacs v. Sprint Corp.*, 261 F.3d 679 (7th Cir. 2001); *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672 (7th Cir. 2001); *In re Rhone–Poulenc Rorer Inc.*, 51 F.3d 1293 (7th Cir. 1995)); *Dolmage v. Combined Ins. Co. of Am.*, No. 14 C 3809, 2017 WL 1754772, at *5-6 (N.D. Ill. May 3, 2017) (citing *Bridgestone/Firestone*). Where claims must be adjudicated under the differing laws of numerous jurisdictions, it is likely that "a single . . . class is not manageable." *Bridgestone/Firestone*, 288 F.3d at 1018.

To the extent that plaintiffs attempt to assert claims on behalf of class members in states where they do not reside and were not injured, "it would . . . be inappropriate to engage in wide-ranging discovery premised on a prospect as to which there is substantial doubt—namely, [plaintiff's] ability to assert causes of action created by other states for the benefit of other individuals injured in those other states." *Liston*, 254 F. Supp. 3d at 1001-02. Any such claims are dismissed, although plaintiffs may move to amend their complaint if circumstances arise to support it.

## IV.    FAILURE TO STATE A CLAIM

Defendants argue that plaintiffs fail to state a claim because they have not pleaded their claims with particularity in accord with Rule 9(b) and they have used improper group pleading.

### A.  Rule 9(b) and Particularity

Defendants argue that plaintiffs' complaint fails to meet the Rule 9(b) standard because, although plaintiffs' claims depend on their allegation that the practice of reshelving used products was widespread at Ulta stores all over the country, they do not identify who set this policy, which products it applied to, which stores in which locations followed it, or when the alleged misrepresentations or omissions were made. Without such details, defendants argue, plaintiffs'

claims rest in large part on anonymous or pseudonymous allegations posted on social media networks and declarations from a handful of employees, which are insufficient to make claims of nationwide fraud plausible. Additionally, defendants argue that plaintiffs' allegations offer insufficient detail because many plaintiffs do not identify the particular Ulta store at which they shopped; the products they purchased, apart from generic descriptions such as "lipstick" or "eyeliner"; or precisely when they purchased them, apart from a month or year.

The Court disagrees. First, plaintiffs were not required to plead every detail of how defendants carried out the alleged deception, particularly considering that pleading such details would require inside knowledge of the defendant business entities' inner workings, which mere customers cannot realistically obtain. Plaintiffs cannot know precise details of how, when, and by whom used products were restored and returned to Ulta shelves. *See U.S. ex rel. Ceas v. Chrysler Grp. LLC*, No. 12-CV-2870, 2016 WL 6963060, at *4 (N.D. Ill. Jan. 19, 2016) (quoting *U.S. ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 125 (D.D.C. 2015)) ("'The complaint makes clear, in other words, that corporate levers were pulled; identifying precisely who pulled them is not an inexorable requirement of Rule 9(b) in all cases.'").

Plaintiffs' allegations of defendants' business practices are based on information and belief. Fraud can be pleaded based on information and belief "so long as (1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides the ground for his suspicions." *Pirelli*, 631 F.3d at 443 (internal quotation marks omitted). As the Court has already explained, this is a case in which "the facts constituting the fraud are not accessible" to plaintiffs because they cannot know how Ulta stores managed their inventory, as that is a part of defendants' operations that is hidden from public view. Further, plaintiffs have provided the ground for their suspicions: they have pointed to specific accounts by people who claim to have personal

knowledge of defendants' business practice of placing used beauty products back on store shelves for resale. Although the accounts in the media and social media are often either anonymous of pseudonymous, they are corroborated by the five employee declarations and by the named plaintiffs' allegations of suffering infections after shopping at Ulta and of purchasing Ulta products that physically appeared to have been previously used. Remaining sensitive to "information asymmetries that may prevent a plaintiff from offering more detail," the Court agrees with plaintiffs that they have stated sufficient facts with a sufficient degree of particularity to make the alleged fraud plausible. *See id.* at 443.

As for defendants' arguments that the named plaintiffs were required to allege additional details about the transactions in which they purchased used Ulta products, the Court agrees with plaintiffs that "Rule 9(b) does not demand that level of granularity or precision, at least in this case." *Hobbs v. Gerber Prods. Co.*, No. 17 CV 3534, 2018 WL 3861571, at *6 (N.D. Ill. Aug. 14, 2018). While there is a "good deal of caselaw that speaks of a journalistic-type approach to [Rule 9(b)'s] requirement of pleading 'with particularity,' that locution really does not fit well in dealing with extended fraudulent schemes involving a large volume of transactions—it must be remembered that what Rule 9(b) mandates particularity about are 'the circumstances constituting fraud.'" *U.S. ex rel. Salmeron v. Enter. Recovery Sys., Inc.,* 464 F. Supp. 2d 766, 768 (N.D. Ill. 2006) (Shadur, J.). The deception in this case stems from Ulta's behind-the-scenes inventory management, rather than from what happened at the cash register, and plaintiffs have described those behind-the-scenes circumstances with as much particularity as they are able, as outsiders looking in. The details of the transactions in which they purchased Ulta products are closer to an issue of damages, and Rule 9(b) does not require that circumstances relating to damages be pleaded

with particularity.  *Hobbs*, 2018 WL 3861571, at *10.  Defendants' motion to dismiss for failure to comply with Rule 9(b) is denied.

### B.  Group Pleading

Defendants argue that plaintiffs' complaint should be dismissed because plaintiffs make no effort to differentiate between Ulta Beauty and Ulta Salon.  Plaintiffs refer to defendants collectively as "defendants" or "Ulta," but as plaintiffs themselves recognize, Ulta Beauty is a holding company that conducts operations only though subsidiaries such as Ulta Salon; Ulta Beauty conducts no operations of its own.  According to defendants, this is improper group pleading because Ulta Beauty and Ulta Salon "are entitled to know the specific allegations levelled against each of them" (Defs.' Mem. Supp. Mot. Dismiss at 14, ECF No. 100), without having to guess who is accused of doing what.

Plaintiffs allege that Ulta Salon was originally incorporated in 1990 with no parent corporation and "total operating authority over its stores."  (2d Am. Compl. ¶¶ 35, 37; *see* Pl.'s Mem. Opp'n at 11, ECF No. 122.)  On January 29, 2017, plaintiffs allege, the company reorganized.  Ulta Beauty was incorporated as a new company that has "on a consolidated basis, the same assets, businesses, and operations" as Ulta Salon had prior to the reorganization.  (2d Am. Compl. ¶ 39.)  Thus, Ulta Beauty became the successor to Ulta Salon, "the former publicly-traded company and now a wholly owned subsidiary" of Ulta Beauty.  (*Id.*)  Plaintiffs note that, in forms it has filed with the Securities and Exchange Commission, Ulta Beauty has explicitly and intentionally used collective terms such as "we," "us," "Ulta Beauty" or "the Company" to refer to "Ulta Beauty, Inc. and its consolidated subsidiaries." (*Id.*)  Further, plaintiffs allege that Ulta Salon "does not appear to have a CEO, Chairman of the Board, or Board of Directors separate from Ulta Beauty, Inc.  As a result, there is no separate decisionmaking apparatus for Ulta Salon .

. . and the Board of Directors and CEO of Ulta Beauty exert direct control over Ulta Salon." (*Id.* ¶ 36.) Additionally, the entities allegedly have the same general counsel and same address. (2d Am. Compl., Ex. F.)

While it is true that "[e]ach defendant is entitled to know what he or she did that is asserted to be wrongful," *Bank of America, N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013), defendants have not cited a case in which a court found analogous allegations against two such intertwined business entities to be impermissible group pleading. Plaintiffs have alleged that, less than a year before the date of this lawsuit, and therefore during the time period that the alleged wrongdoing was taking place, which is "at least as long as the relevant statute of limitations periods" (2d Am. Compl. ¶ 4), Ulta Salon reorganized into two companies, which apparently share a CEO and Board of Directors. The Court understands plaintiffs to be accusing both entities of wrongdoing, at different times and potentially at the same time to the extent they operated as one after the reorganization, although plaintiff cannot say at this early stage who pulled which "corporate lever." *Ceas*, 2016 WL 6963060, at *4. By providing facts to describe the reorganization and the resulting shared corporate structure in some detail, they have alleged a plausible basis for asserting claims against both entities. *See Rysewyk v. Sears Holdings Corp.*, No. 15 CV 4519, 2015 WL 9259886, at *7 (N.D. Ill. Dec. 18, 2015) (plaintiffs stated claim against holding company as well as operating subsidiary because they alleged that holding company participated in "market[ing], sell[ing], and servic[ing]" the offending products "through its retail establishments"). Although plaintiffs' theory of which entity is responsible for which acts may need to be refined as the case progresses, plaintiffs' allegations are sufficient at this early stage to state a claim that survives defendants' motion to dismiss.

### C. Breach of Warranty Claims and Pre-Suit Notice

Defendants contend that plaintiffs' breach of warranty claims must be dismissed because plaintiffs did not give defendants the pre-suit notice that the Uniform Commercial Code requires.[1]

#### *1. Pre-suit notice by plaintiff Smith-Brown as to Ulta Salon*

Before plaintiff Smith-Brown filed her initial complaint in this matter, she submitted her pre-suit notice letter only to Ulta Beauty. Defendants argue that the letter did not provide effective notice to Ulta Salon.

Plaintiffs respond that Smith-Brown's letter, although addressed only to Ulta Beauty, nevertheless provided effective notice to Ulta Salon because the two entities share the same address, the same general counsel, and the same corporate secretary. According to plaintiffs, Ulta Salon therefore had "actual knowledge" of Smith-Brown's grievance prior to the filing of her complaint, and "lack of pre-litigation notice is excused" when the defendant has "actual knowledge" of the defect. *See Fuchs v. Menard, Inc.*, No. 17 C 1752, 2017 WL 4339821, at *6 (N.D. Ill. Sep. 29, 2017).

The Court might agree with plaintiffs' legal reasoning under Illinois law, but Smith-Brown is a citizen of California who allegedly purchased used Ulta products in California, so California law presumably applies to her claims. Plaintiffs have not cited a case in which a court recognized an "actual knowledge" exception to the pre-suit notice requirement under California law. Plaintiffs cite *In re Ford Motor Co. E-350 Van Prod. Liability Litigation (No. II)*, No. CIV03-4558, 2008 WL 4126264, at *10-11 (D.N.J. Sept. 2, 2008), which considered breach of warranty claims under Alabama, Arkansas, California, and Illinois law, but that case never suggested that there is any

---

[1] Defendants also argue that plaintiffs do not state breach of warranty claims as to any new products. The Court need not address this argument because it has already concluded that plaintiffs have no standing to bring any such claims.

16

"actual knowledge" exception to the pre-suit notice requirement under California law. Instead, it recognized a California exception to the pre-suit notice requirement only for "'injured consumers against manufacturers with whom they have not dealt'" because an injured consumer who is not "'steeped in the business practice which justifies the rule'" will rarely be savvy enough to "'give notice to one with whom he has had no dealings.'" *Id.* at *10 (quoting *Greenman v. Yuba Power Prods.*, 377 P.2d 897, 888 (Cal. 1963)). This exception is of no use to Smith-Brown in this case because she is not suing a remote manufacturer "with whom [she has] not dealt"; instead, she is suing the retailer who was the immediate seller of the product that harmed her, so the exception does not apply.

Nevertheless, the Court will not dismiss Smith-Brown's breach of warranty claim at this early stage. As the Court has explained above in Part IV.B. of this opinion, plaintiffs allege that Ulta Beauty and Ulta Salon are intertwined entities that shared directors and officers, as well as a general counsel and address. If plaintiffs' allegations are proved true, it may be that Smith-Brown's pre-suit notice to Ulta Beauty was effective as to Ulta Salon, based on the interconnectedness of the entities. *Cf. Incubadora Mexicana, SA de CV v. Zoetis, Inc.*, 310 F.R.D. 166, 174 (E.D. Pa. 2015), *background facts in earlier opinion at* 116 F. Supp. 3d 519, 522 (E.D. Pa. 2015) (pre-suit notice to subsidiary not effective as to parent company where subsidiary "was to . . . operate as an independent company" and moved its "global headquarters" to another state to "complete[] its corporate separation" from parent). Ulta Salon's motion to dismiss Smith-Brown's breach of warranty claim for lack of pre-suit notice is denied.

### 2. *Pre-suit notice by other plaintiffs*

Smith-Brown initially filed this case as a lone plaintiff on January 26, 2018. The other plaintiffs only became parties when they joined in the Second Amended Complaint on June 6,

2018. Defendants argue that these other plaintiffs did not provide pre-suit notice prior to the filing of this suit, so their breach of warranty claims must be dismissed.

Plaintiffs respond that the other plaintiffs were not required to submit pre-suit notice before this action was filed; they were merely required to give pre-suit notice before they became parties to it, and each of them did provide pre-suit notice prior to filing the Second Amended Complaint, if not prior to Smith-Brown's original complaint.

The Court agrees with plaintiffs that their notice was sufficient. "The purpose of the pre-suit notice requirement is to give sellers the opportunity to resolve breaches short of litigation." *Ulrich*, 2017 WL 3581183, at *8. In order to do that, they must have notice of "the trouble with a particular product purchased by a particular buyer"; general awareness of a certain recurring complaint with the sellers' products is beside the point. *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 590 (Ill. 1996); *see id.* at 591-92 ("As Judge Learned Hand stated . . . : 'The notice of the breach required is not of the facts, which the seller presumably knows quite as well as, if not better than, the buyer, but of *buyer's claim* that they constitute a breach.'") (quoting *Am. Mfg. Co. v. U.S. Shipping Bd. Emergency Fleet Corp.*, 7 F.2d 565, 566 (2d Cir. 1925)). Because the required notice is of a particular buyer's claim that the seller is in breach of warranty, plaintiffs complied with the notice requirement to the extent that they individually provided notice of their claims prior to joining this suit, regardless of whether another plaintiff had already filed suit. Defendants' motion to dismiss is denied as to this basis.

### 3. *Pre-suit notice by New Jersey plaintiff Allison Sot*

Defendants argue that New Jersey plaintiff Allison Sot, unlike the other plaintiffs, did not provide notice of her claims prior to joining the Second Amended Complaint, so her breach of warranty claim should be dismissed.

Plaintiffs respond that, under New Jersey law, plaintiffs need not provide pre-suit notice at all; rather, the filing of the complaint is sufficient to permit the seller to redress the buyer's grievance by settling the dispute. *See Strzakowlski v. Gen. Motors Corp.*, No. CIV.A. 04-4740, 2005 WL 2001912, at *3-4 (D.N.J. Aug. 16, 2005). But this relaxed version of the pre-suit notice requirement only applies, if at all, to claims against remote manufacturers, not claims against immediate sellers of defective products. *Id.* Because Sot's claim is against the immediate seller of the defective beauty products she complains of purchasing, the pre-suit notice requirement applies in full force. Plaintiff Sot's breach of warranty claim is dismissed.

### D. Unjust Enrichment

Defendants argue that plaintiffs fail to state a claim for unjust enrichment because they have adequate remedies at law and because there is no private cause of action for unjust enrichment under California or New Jersey law.[2]

#### 1. Adequate remedies at law

Defendants argue that unjust enrichment is unavailable where there is an otherwise adequate remedy at law, such as a cause of action for breach of contract. Plaintiffs respond that, under Rule 8, which permits them to plead alternative theories of relief, Fed. R. Civ. P. 8(a)(3), (d)(2)-(3), they may plead their unjust enrichment claims in the alternative to their breach of contract and consumer fraud claims. Plaintiffs are correct. *See, e.g., Estate of Stepney v. UMG Recordings, Inc.*, No. 10 C 8266, 2011 WL 2119130, at *3 (N.D. Ill. May 26, 2011) ("Although Plaintiffs may not recover under a theory of unjust enrichment where there is an adequate remedy at law, Plaintiffs may plead both breach of contract and unjust enrichment in the alternative.");

---

[2] Defendants also argue that plaintiffs do not state unjust enrichment claims as to any new products, but the Court need not address this argument because it has already concluded that plaintiffs have no standing to bring any such claims.

*Sharbaugh v. First Am. Title Ins. Co.*, No. 07 C 2628, 2007 WL 3307019, at *2 (N.D. Ill. Nov. 2, 2007) ("[P]laintiff may plead an alternative claim for unjust enrichment, even if he alleges in other counts that the parties have a contract or he has an adequate remedy at law."); *see also Horwitz v. Sonnenschein Nath & Rosenthal LLP*, 926 N.E.2d 934, 947 (Ill. App. Ct. 2010) ("But where a party pleads breach of contract, he also can plead unjust enrichment in the alternative.").

Defendants cite federal and state court decisions in a number of states—California, Florida, Georgia, Indiana, Maryland, Michigan, Nevada, New York, Ohio, and Washington—dismissing unjust enrichment claims because the plaintiffs had an adequate remedy at law. (Defs.' Mem. at 19.) Many of these cases are distinguishable because the complaints did not admit of any possibility that the plaintiffs' allegations were true *and* that they had no adequate remedy at law, but defendants do not establish that that is precisely the case here. They argue that an unjust enrichment claim simply cannot be pleaded alongside a claim for a legal remedy, but as a general matter, under Rule 8, defendants are incorrect, as even courts in some of the jurisdictions they cite have recognized. *See, e.g., Napa Overseas, S.A. v. Nextran Corp.*, No. 16-20862-CIV, 2016 WL 3841677, at *5 (S.D. Fla. July 12, 2016) ("[N]othing prevents Plaintiff from pursuing alternative claims of breach of contract and unjust enrichment in separate counts."); *GlaxoSmithKline LLC v. Beede*, No. 1:13-CV-00001, 2014 WL 896724, at *7 (N.D.N.Y. Mar. 6, 2014) ("Initially, Plaintiff is permitted at this stage of the proceedings to pursue the alternate theories of breach of contract and unjust enrichment."). The basic proposition that unjust enrichment is unavailable to a plaintiff with an adequate remedy at law, by itself, does not require this Court to dismiss plaintiffs' alternative unjust enrichment claim. Defendants' motion is denied as to this basis.

## 2. *California and New Jersey law*

Defendants argue that plaintiffs' unjust enrichment claim should be dismissed to the extent it is governed by California or New Jersey law because unjust enrichment is not a stand-alone cause of action under the law of these states.

In similar circumstances, a court of this district has recognized an unjust enrichment claim under California law. *See Carrol v. S.C. Johnsons & Son, Inc.*, No. 17-CV-05828, 2018 WL 1695421, at *5-6 (N.D. Ill. Mar. 29, 2018). This Court is persuaded by that court's reasoning to follow suit and deny defendants' motion to dismiss plaintiffs' unjust enrichment claim under California law.

As for unjust enrichment under New Jersey law, defendants argue that plaintiffs must show not only that defendants received a benefit that it would be unjust to retain, but also that plaintiffs "expected remuneration" from defendants at the time they "performed or conferred a benefit" on defendants. *Nelson v. Xacta 3000 Inc.*, No. 08 C 5426, 2009 WL 4119176, at *7 (D.N.J. Nov. 24, 2009). According to defendants, plaintiffs have not alleged that they "expected remuneration" at the time they purchased defendants' products. But other New Jersey decisions have phrased the remuneration element differently, instead requiring that the plaintiff "expected remuneration, ***or, if the true facts were known to plaintiff, he would have expected remuneration from defendant***, at the time the benefit was conferred." *Callano v. Oakwood Park Homes Corp.*, 219 A.2d 332, 334-35 (N.J. App. Div. 1966) (emphasis added); *see In re NorVergence, Inc.*, 384 B.R. 315, 361-62 (Bankr. D.N.J. 2008) (denying motion to dismiss unjust enrichment claim brought by plaintiffs who alleged that they signed "leases for significantly overvalued equipment" because "it [was] plausible that if the [plaintiffs] had known the truth about the [equipment] when they entered the equipment lease, then they would have expected remuneration from Nortel who arguably benefited

from the arguably overpriced [equipment].")  The Court is not persuaded that New Jersey would not recognize plaintiffs' unjust enrichment claim.  Defendants' motion is denied as to the unjust enrichment claim.

### A.  State Deceptive Business Practices Statutes

Defendants argue that plaintiffs' claims fail under certain state consumer fraud and deceptive business practices statutes for the following various reasons.[3]

#### 1.  *California, Florida, Pennsylvania, and Michigan—No Facts About Used Products*

Defendants argue that the Florida, Pennsylvania, and Michigan plaintiffs, as well as California plaintiff Robin Okman, fail to state a claim under the deceptive business practices statutes of those states because they state no facts to support or corroborate their belief that they purchased used products.  Unlike some of the plaintiffs, defendants argue, these plaintiffs' claims are purely conclusory because they do not allege that they suffered infections from using defendants' products or that the products they purchased were noticeably used.

But the Court is not required to view these particular plaintiffs' allegations in isolation.  When their allegations are viewed in light of all the other allegations of the complaint, including the social media revelations, the former employee declarations, and the allegations of the other named plaintiffs who suffered infections or bought products that appeared to be used, it is at least plausible that these plaintiffs also received used products.  These plaintiffs may ultimately have difficulty proving their claims, but they need not prove them in the complaint; their claims need only be plausible.  *FKFJ, Inc. v. Vill. of Worth*, No. 18 C 2828, 2019 WL 277723, at *5 (N.D. Ill.

---

[3] Defendants also argue that plaintiffs' claims fail under the various state statutes to the extent they seek relief for the purchase of new products.  The Court need not address this argument because it has already explained that plaintiffs have no standing to assert claims for the purchase of new products.

Jan. 22, 2019) (citing *Iqbal*, 556 U.S. at 678). These plaintiffs' claims survive defendants' motion to dismiss.

### 2. Alabama—Pre-Suit Notice

Next, defendants argue that plaintiffs' claim under the Alabama Deceptive Trade Practices Act ("ADTPA") must be dismissed because plaintiffs did not provide adequate pre-suit notice at least fifteen days prior to filing the Second Amended Complaint, as the statute requires. Ala. Code § 8-19-10(e). The Court agrees with defendants. Plaintiffs provided their pre-suit notice letter on May 23, 2018, only fourteen days prior to the filing of the Second Amended Complaint on June 6, 2018. Plaintiffs argue that the Court should excuse their failure to provide timely pre-suit notice because they substantially complied with the fifteen-day requirement by providing notice fourteen days before filing suit and because defendants had actual notice of the issues plaintiffs raised long before May 23, 2018. But plaintiffs cite no authority to support giving the ADTPA's fifteen-day requirement a liberal construction or implying a substantial compliance or actual notice exception, nor is the Court aware of any. With only the plain language of the statute for guidance, the Court must apply the statute as written. Plaintiffs' claim under the ADTPA must be dismissed.

### 3. California—"Unfair" conduct

Defendants argue that plaintiffs' claim under California's Unfair Competition Law ("UCL") must be dismissed because plaintiffs have not alleged any conduct that is "unfair" within the meaning of that statute. According to defendants, the "unfair" conduct that the statute prohibits is the sort of unfair competition that the antitrust laws are meant to protect against. Plaintiffs respond that, while there is a split of authority, some California courts have taken a different approach, instead analyzing whether a challenged business practice is unfair by "weigh[ing] the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *S. Bay*

*Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 886-87, 85 Cal. Rptr. 2d 301, 316 (1999).

Defendants' position is based on *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 973 P.2d 527, 543-44 (Cal. 1999), in which the California Supreme Court criticized the balancing test plaintiffs proffer as "amorphous," and instead explained that "unfair" conduct is that which "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." However, the court specifically cautioned that its "discussion and this test are limited to [the] context" of "an action by a competitor alleging anticompetitive practices." *Id.* at 544 n.12. California decisions are split on whether the test differs in consumer actions—like this one—alleging unfairness to the defendant's customers, as opposed to "suits involving unfairness to the defendant's competitors," such as *Cel-Tech*. *See Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 735-36 (9th Cir. 2007) (citing cases). Notably, the case plaintiffs cite in support of applying the balancing test, *South Bay Chevrolet v. General Motors Acceptance Corp.*, was decided a month after the California Supreme Court's decision in *Cel-Tech*, and it expressly interpreted that case as limited to the competitor context. *S. Bay*, 85 Cal. Rptr. 2d at 309 n.9. The Court is not persuaded that plaintiffs' allegations do not fall within a valid theory of unfairness under the UCL. *See Lozano*, 504 F.3d at 736. Defendants' motion to dismiss is denied as to this claim.

### 4. *Wisconsin—Omissions Not Actionable*

Defendants argue that plaintiffs' claims fail under the Wisconsin Deceptive Trade Practices Act ("WDTPA") because omissions are not actionable under that statute.[4] Plaintiffs respond that

---

[4] In their opening brief, defendants made a similar argument about the Indiana Deceptive Consumer Sales Act ("IDCSA"), but in response, plaintiffs explained that that statute has recently been amended and

they are proceeding not on an omission theory but on the theory that defendants affirmatively represented that their products were new by offering them for sale in Ulta stores. But plaintiffs have not cited a case in which any court recognized any such theory under Wisconsin law. The only case plaintiffs cite is distinguishable because, there, the plaintiffs claimed to have been deceived by affirmative misrepresentations of quality on the packaging of the defendants' products. *See Loeb v. Champion Petfoods USA Inc.*, No. 18-CV-494-JPS, 2018 WL 2745254, at *6-7 (E.D. Wis. June 7, 2018) (denying motion to dismiss WDTPA claim that dog food was contaminated with heavy metals because dog food packaging contained "representations of quality and fitness for [even] human consumption"). In this case, plaintiffs have not pointed to any specific misrepresentations defendants made about whether their products were new or used. Defendants' motion to dismiss is granted as to the WDTPA claim.

### 5. *Nevada—No Affirmative Misrepresentations And No Duty To Disclose*

Defendants move to dismiss plaintiffs' claims under the Nevada Deceptive Trade Practices Act ("NDTPA") because they are not grounded in affirmative misrepresentations about Ulta products, and plaintiffs have not identified any special relationship or other circumstance giving defendants a duty to disclose facts about Ulta products to plaintiffs. The NDTPA defines an actionable deceptive trade practice in various ways, *see* NRS § 598.0915, and all pertinent definitions contain the element of making a false representation of fact. As the Court explained in the preceding subsection of this opinion, plaintiffs have not alleged that defendants made any such affirmative misrepresentation to plaintiffs.

One district court has suggested, in the context of an NDTPA claim, that "the suppression or omission of a material fact is equivalent to a false representation . . . when a party is bound in

expanded to cover omissions. Defendants apparently concede the point because they do not mention the statute at all in their reply. The Court considers defendants to have waived their argument on this point.

good faith to disclose that material fact." *Mallory v. McCarthy & Holthus, LLP*, No. 2:14-CV-00396, 2015 WL 2185413, at *3 (D. Nev. May 11, 2015). But the court apparently imported this principle from Nevada's common law of fraud without any authority for applying it to NDTPA claims, and neither in *Mallory* nor in any other case plaintiffs have cited has a court permitted a plaintiff to proceed under the NDTPA without pleading that the defendant made specific, affirmative misrepresentations. Applying the plain language of the statute, the Court concludes that plaintiffs must plead an affirmative misrepresentation in order to state a claim under the NDTPA. Defendants' motion to dismiss is granted as to the NDTPA claim.

### *6. South Carolina—Class Action Bar*

Federal courts must apply federal procedural law, including Rule 23, even when they are applying state substantive law, so long as doing so does not "abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). Defendants argue that the class claim under the South Carolina Unfair Trade Practices Act ("SCUTPA") should be dismissed because the SCUPTA expressly prohibits class actions:

> (a) Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by § 39-5-20 may bring an action individually, ***but not in a representative capacity***, to recover actual damages.

S.C. Code § 39-5-140 (emphasis added). Defendants cite only a single case, *Fejzulai v. Sam's West, Inc.*, 205 F. Supp. 3d 723, 727-28 (D.S.C. 2016). *Fejzulai* reasoned that the SCUTPA's class action bar is part and parcel of the substantive right that the SCUTPA confers because it is incorporated into the core provision of the SCUTPA, and the bar therefore applies in any action to enforce that substantive right, whether in federal or state court. *Id.*

Plaintiffs argue that the SCUTPA's class action bar is procedural, not substantive, and Rule 23 "unambiguously authorizes *any* plaintiff, in *any* federal civil proceeding, to maintain a class

action if the Rule's prerequisites are met," so the Court must apply Rule 23 instead of the SCUTPA's class action bar. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 416-17 (2010) (New York class action bar does not preclude federal courts sitting in diversity from entertaining Rule 23 class actions governed by New York substantive law).

A leading treatise states that "[m]ost courts considering the question have determined that the legislature's placement of a class action prohibition within a specific state consumer protection act (as opposed to a free-standing rule of procedure) does not necessarily mean that the prohibition is a substantive one." 1 *McLaughlin on Class Actions* § 2:47 (15th ed.) (citing *Reed v. Dynamic Pet Prods.*, No. 15CV0987-WQH-DHB, 2016 WL 3996715, at *6 (S.D. Cal. July 21, 2016) and *In re Hydroxycut Mktg. & Sales Practices Litig.*, 299 F.R.D. 648, 654 (S.D. Cal. 2014)); *but see Delgado v. Ocwen Loan Servicing, LLC*, No. 13CV4427, 2017 WL 5201079, at *10 (E.D.N.Y. Nov. 9, 2017) (reasoning that "the specific inclusion of a class action bar in . . . consumer protection laws evinces a desire by the state legislature to limit not only the form of the action but also the remedies available"). This Court agrees with those decisions holding that the fact that a class action bar is included within a consumer protection statute does not make it any more substantive than if it were found instead among the state's rules of procedure. *See Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1336 (11th Cir. 2015) ("[H]ow a state chooses to organize its statutes affects the analysis not at all. . . . [T]he question whether a federal rule abridges, enlarges, or modifies a substantive right turns on matters of substance—not on the placement of a statute within a state code."). The class action mechanism is merely a way of joining numerous plaintiffs' claims together in order to adjudicate them more efficiently; a law permitting it or prohibiting it is procedural, not substantive, because it does not alter the nature of

the claim or the right that gives rise to it.  In this vein, one district court, guided by *Shady Grove*, reasoned as follows:

> In *Shady Grove,* Justice Scalia explained:
>
>> A class action no less than traditional joinder (of which it is a species), merely enables a federal court to adjudicate claims of multiple parties at once, instead of separate suits. And like traditional joinder it leaves the parties' legal rights and duties intact and the rules of decision unchanged.
>
> *Shady Grove*, 559 U.S. at 408. Conversely, a rule barring class actions does not prevent individuals who would otherwise be members of the class from bringing their own separate suits or joining in a preexisting lawsuit. The substantive rights of these individuals are not affected. The prohibitions against class actions only affect "how the claims are processed." *Id.* The fact that the class action prohibitions are within the individual state consumer protection acts, as opposed to free-standing rules, does not alter the Court's conclusion.

*Hydroxycut*, 299 F.R.D. at 654 (internal citation altered). The Court finds *Hydroxycut*'s analysis persuasive. Defendants' motion to dismiss is denied as to the SCUTPA claim.

### 7. *Georgia—Injunctive Relief*

Defendants argue that plaintiffs' Georgia Uniform Deceptive Trade Practices Act ("GUDTPA") claims must fail because they do not allege future injury, and the only remedy that the GUDTPA provides is injunctive relief.  Plaintiff Veronica Sanders, the only plaintiff who resides in Georgia, alleges that she wants to shop at Ulta again, but is hesitant to do so while she knows that, in doing so, she would run the risk of purchasing a product that has been previously used by someone else.  (2d Am. Compl. ¶ 25.)

This Court has previously recognized that a plaintiff alleges sufficient facts to assert a claim for injunctive relief in a consumer protection action if she alleges that she faces a "threat of future harm" because "she will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to."  *Curran v. Bayer Healthcare*

*LLC*, No. 17 C 7930, 2019 WL 398685, at *5 (N.D. Ill. Jan. 31, 2019) (citing *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969-70 (9th Cir. 2018)). Defendants do not explain—nor does the Court see—why plaintiff Sanders's allegations do not similarly state a claim for injunctive relief for similar reasons. The case that plaintiffs cite, *Collins v. Athens Orthopedic Clinic*, 815 S.E.2d 639, 646-47 (Ga. App. Ct. 2018), sheds little light on the question because it concerned a defendant's lax information security practices, which had allowed a hacker to steal plaintiffs' personally identifiable information. Once stolen, such information cannot be stolen again; but a consumer who unwittingly buys previously used beauty products could be victimized again in the same way by the same retailer. *Collins* is distinguishable, and defendants' motion is denied as to this claim.

## CONCLUSION

Defendant's motion to dismiss [99] is granted in part and denied in part. The motion is granted as to (1) any claims based on the purchase of new products, (2) any claims on behalf of prospective class members residing outside the states represented by the named plaintiffs, (3) plaintiff Sot's breach of warranty claim under New Jersey law, (4) any claim under the Alabama Deceptive Trade Practices Act, (4) any claim under the Wisconsin Deceptive Trade Practices Act, and (6) any claim under the Nevada Deceptive Trade Practices Act. The motion is otherwise denied.

**SO ORDERED.**                                          **ENTERED:  February 26, 2019**


_____
**JORGE L. ALONSO**
**United States District Judge**